UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DAVID HAINES, individually, on behalf of the Company Retirement Savings Plan & Trust, and on behalf of all similarly situated participants and beneficiaries of the Company Retirement Savings Plan & Trust,<br><br>Plaintiff,<br><br>v.<br><br>T-MOBILE USA, INC., T-MOBILE RETIREMENT PLANS COMMITTEE, and JOHN or JANE DOES 1-10,<br><br>Defendants. | NO.<br><br>**CLASS ACTION COMPLAINT** |

## I. NATURE OF ACTION

1. David Haines ("Plaintiff"), individually and as representative of a Class of Participants and Beneficiaries of the Company Retirement Savings Plan & Trust (the "Plan"), through counsel, brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1001–1461, against Defendants, T-Mobile USA, Inc., ( "Company"), T-Mobile Retirement Plans Committee ("401(k) Committee") and Does 1-10 (together with Company and 401(k) Committee, "Defendants" or "Plan Fiduciaries") for: (1) breach of ERISA's fiduciary duties; (2) violation of ERISA's prohibited transaction rules; (3) violation of ERISA's anti-inurement provision and (4) failure to monitor co-fiduciaries.

2. ERISA requires 401(k) plan fiduciaries to act "solely in the interest of participants," with "the care, skill, prudence, and diligence" of a prudent person, "in accordance



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in their own interest. 29 U.S.C. §§ 1104(a)(1), 1106(a)(1)(D), 1106(b)(1). ERISA fiduciary duties are the highest known to law.

3. The Plan Fiduciaries fell well short of these strict fiduciary duties by consistently retaining various share classes of T. Rowe Price Growth Stock collective trusts (the "TRP Growth Stock Fund") for years, even though by 2020 at the latest they failed to satisfy investment manager metrics used by investment experts to determine if an investment option is prudent under the appropriate standard of care under the circumstances prevailing prior to and throughout the over the relevant "Class Period" (August 19, 2020 through the date of judgment).

4. More specifically, prior to and throughout the Class Period the TRP Growth Stock Fund glaringly underperformed minimum acceptable standards for prudent investments as well as alternative available peer substitutes under nearly all important Modern Portfolio Theory ("MPT") investment metrics. If Defendants had complied with their fiduciary duties to monitor their investments, they would have removed the unsuitable and underperforming TRP Growth Stock Fund by 2020 at the latest but did not do so.

5. Defendants' failure to conduct a reasonably prudent process to investigate and monitor investment options within the Plan and remove unsuitable and underperforming investments reduced Plan participants' retirement funds by tens of millions of dollars.

6. As a result of this imprudent activity, Plaintiff and the other Plan participants have suffered over $100 million in damages.

7. Separately and additionally, instead of prudently and loyally evaluating how to allocate plan expenses and best deploy plan assets that had been forfeited by departing Plan participants, Defendants instead reflexively used those forfeitures to benefit Company, to the detriment of the Plan and its participants, by considering the best interest of Company instead of loyally acting in the best interest of Plan participants. Instead, Defendants applied millions of Plan forfeitures to offset Company's contractual obligations to make Non-discretionary



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Matching Contributions to the Plan between 2020-2024 instead of applying forfeitures to defray plan expenses as required by the terms of the Plan and ERISA. Defendants' cavalier decision to use Plan forfeitures to benefit Company resulted in Plan participants paying millions of dollars in Plan expenses to the Plan's third-party service providers, both directly and indirectly, that should never have come out of (or reduced the value of) the accounts of Plan participants.

8. Plaintiff therefore brings this ERISA action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and Rule 23 of the Federal Rules of Civil Procedure, as a representative of a class of participants and beneficiaries of the Plan, against Company, and the Committee for violations of ERISA with regard to the Plan.

## II. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

10. This Court has personal jurisdiction over Defendants because they are headquartered in this district, they reside in this district, transact business in this district, have significant contacts with this district, and because ERISA provides for nationwide service of process.

11. Venue is appropriate in this district within the meaning of 29 U.S.C. § 1132(e)(2) because some or all of the violations of ERISA occurred in this district, Plaintiff was harmed in this district, and Defendants reside and may be found in this district.

## III. PARTIES

12. Plaintiff is a resident of the state of North Carolina. Plaintiff is a current participant in the Plan under 29 U.S.C. § 1002(7) and has been a participant throughout the Class Period, which is July 30, 2020, through the date of trial.

13. Plaintiff worked at T-Mobile, USA Inc. during the Class Period and continues to work there.

14. During the Class Period, Plaintiff invested in the TRP Growth Stock Fund.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

15. Plaintiff has Article III standing to bring this action on behalf of the Plan because Plaintiff suffered concrete and particularized injuries through the imprudent decisions made by Defendants, including the decision to include, and not to remove, the TRP Growth Stock Fund from the Plan. Those injuries are fairly traceable to Defendants' unlawful conduct and breach of their fiduciary duties under ERISA, and those harms are likely to be redressed by a favorable judgment providing appropriate equitable relief to Plaintiff and to the Class.

16. Plaintiff like all participants in the Plan, lacked knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed. For instance, among other factors, Plaintiff and the other participants did not have access to comparisons of the Plan's investment performance relative to other available investment alternatives. Plaintiff further lacks actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan, including Defendants' processes for monitoring and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn plausible inferences of fiduciary imprudence regarding these processes based upon (among other things) the facts and analysis set forth in this Complaint.

17. Having never managed a large 401(k) Plan, Plaintiff and all participants in the Plan, lacked actual knowledge of Defendants' obligation to conduct a prudent and loyal analysis of investment options within the Plan, and to regularly review those investment options to ensure that they are performing at an acceptable level.

18. Plaintiff also has Article III standing to bring this action on behalf of the Plan because he suffered actual injuries through the diminishment of his individual Plan accounts by administrative expenses that should have been paid for with Plan forfeitures. This injury is fairly traceable to Defendants' unlawful conduct in using Plan forfeitures for their own benefit by offsetting Company's contribution obligations when they could have used them for the benefit of the Plan and its participants by defraying administrative expenses, and this harm is likely to be redressed by a favorable judgment providing relief to the Plan.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

19. Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the misallocation of Plan forfeitures – hereafter sometimes "Forfeited Plan Assets") necessary to understand that Defendants breached their fiduciary duties and ERISA's prohibited transaction rules until shortly before this suit was filed.

20. Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2) on behalf of the Plan and for relief that sweeps beyond his own injuries.

21. Company is headquartered in Bellevue, Washington. It is the sponsor of the Plan. Company administers the Plan from Bellevue, Washington.

22. Company acted through its officers and Board of Directors to perform Plan-related fiduciary functions in the course and scope of business. Company and its Board appointed other Plan fiduciaries on the 401(k) Committee and accordingly had a fiduciary duty to monitor and supervise those appointees. For these reasons, Company and its Board are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

23. The Plan is administered by the 401(k) Committee. As the Plan Administrator, the 401(k) Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The 401(k) Committee has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

24. Plaintiff is currently unaware of the identities of the individual members of the Board or Committee.

25. Under 29 U.S.C. § 1109, plan fiduciaries are "personally liable to make good to such plan any losses to the plan resulting from each such breach [of fiduciary duty]."

26. Hereinafter, anyone who exercised discretion over the administration and management of the Plan and/or control of Plan assets will be referred to as Plan Fiduciaries or Defendants.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## IV. FACTUAL ALLEGATIONS APPLICABLE TO CLAIMS 1 AND 2

27. The Plan Fiduciaries added the TRP Growth Stock Fund to the Plan's investment lineup sometime prior to 2012.

28. As of December 31, 2024, Plan participants had invested over $602M of their retirement savings in the TRP Growth Stock Fund.

29. As described in detail below and summarized in this table, Defendants' failure to remove the unsuitable and underperforming TRP Growth Stock Fund from the Plan has caused the Plan participants to suffer losses over $100M.[1]

**Approximate Performance Losses and Metrics January 1, 2020 to December 31, 2025**

| Investment Name | Total # of Metrics Analyzed | # of Metrics Underperformed | Percentage of Metrics Underperformed | Performance Losses ($) vs. Comparators |
|---|---|---|---|---|
| Alger Focus Equity Z | 60 | 60 | 100% | -$318,690,751 |
| Fidelity BlueChip Growth Commingled Pl Z | 60 | 60 | 100% | -$251,250,821 |
| JPMCB Growth Advantage Inv | 60 | 55 | 92% | -$180,059,026 |
| Putnam Large Cap Growth R6 | 60 | 56 | 93% | -$113,974,743 |
| The Vanguard Russell 1000 Growth Index | 36 | 36 | 100% | -$157,920,341 |
| **T. Rowe Price Growth Stock Tr-C Aggregate Summary** | **276** | **267** | **97%** | |

### A. Defendants' Fiduciary Duties Under ERISA.

30. ERISA imposes strict fiduciary duties upon Defendants as fiduciaries of the Plan, including the duty of prudence. These duties apply to all fiduciary acts, including Defendants' selection and retention of investment options for the Plan.

31. ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B).

32. As part of their fiduciary duty, Defendants "ha[ve] a continuing duty to monitor [Plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015); *Johnson v. Carpenters of W. Wash. Bd. of Tr.*, No. 23-35370, 2024 WL 3579492 (9th Cir. July 30, 2024) (unpublished) (plaintiffs sufficiently alleged defendants violated duties of

[1] Underlying data and methodologies used in this Complaint are set forth in the attached Appendices A and B.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

prudence by failing to monitor the challenged investments' performance where they alleged the defendants were on alert that the investments would require close monitoring that went beyond mere tracking of returns and, had they monitored, they would have seen red flags); *Hughes v. Nw. Univ*., 63 F.4th 615, 626–27 (7th Cir. 2023) ("[T]he duty of prudence requires a plan fiduciary to systematically review its funds both at the initial inclusion of a particular fund in the plan and at regular intervals to determine whether each is a prudent investment."), *accord, Morrissey v. Curran,* 567 F.2d 546, 549, n.9 (2d Cir. 1977) (noting that a "trustee's obligation to dispose of improper investments within a reasonable time is well established at common law" and applying this rule in the ERISA context).

33. "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble*, at 530. If an investment is imprudent, Defendants "must dispose of it within a reasonable time." *Id*. (citation omitted).

34. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

35. Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.

36. The standard of care for plan fiduciaries selecting and monitoring investment options under the circumstances prevailing prior to and throughout the Class Period requires an evaluation of several commonly accepted MPT metrics which serve as indicators/predictors as to whether it is reasonable to assume that any particular investment is likely to achieve its goals prospectively and is a reasonable option compared to alternatives that appear to be more likely to achieve their goals.

37. Prudent fiduciaries scrutinize investment managers to determine whether an active manager has demonstrated an ability to succeed in their chosen sector of the market. To perform this analysis, and to distinguish between a skilled manager and an unskilled or lucky one, fiduciaries judge fund performance against both an appropriate index benchmark and a



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

universe of similar funds over periods most closely approximating a market cycle—typically three- and five-year intervals. These time horizons are emphasized by virtually all prudent fiduciaries as the most important to gauge an investment manager's ability to execute their strategy. Accordingly, these two specific time horizons (three- and five-year trailing performance) are typically weighted more heavily than any other timeframes in connection with review of 401(k) investments.

38. Prudent fiduciaries utilize a careful, reasoned investment selection and monitoring process that considers a wide array of metrics commonly accepted and incorporated in MPT that allow the fiduciary to properly assess the prudence of any potential investment. Such an investment selection and monitoring process considers all the appropriate metrics and circumstances present at the time of the selection/retention/removal decision in order to evaluate whether the investment should be selected, retained, or removed.

39. This process, when properly performed, involves a regular review of MPT investment performance metrics against a relevant index and peer group for the most recent calendar quarter end over the previous three- and five-year periods in order to discern any pattern of underperformance. Through this lens, if a fund exhibits a persistent (often two consecutive quarters but at most four consecutive quarters) inability to exceed the returns of its market index and/or rank above a threshold percentile (typically among the top 50% at a minimum) among its peers across a broad range of MPT metrics, prudent fiduciaries remove the fund and perform a detailed analysis to investigate potential replacements.

40. While each different fiduciary may use a slightly different set of MPT metrics weighted slightly differently, there is a set of critical metrics that are relatively more predictive of the results. In other words, regardless of the specific combination of metrics used, if an investment option rates as inferior or imprudent when evaluated by the metrics set forth below, that investment typically also rates as inferior or imprudent under any reasonably prudent combination of metrics and weightings.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

41. Accordingly, a prudent plan fiduciary, when determining whether to retain a "Large Growth" Investment Option, would evaluate and compare the performance and commonly accepted investment performance metrics to meaningful benchmarks including peer alternatives/substitutes, such as the ones identified below, as well as the Russell 1000 Growth Index.[2]

**B. Overview of Commonly Accepted Investment Theories**

42. MPT stands for the proposition that prudent investors create portfolios to maximize the expected return generated by the portfolio for a given level of risk or minimize the level of risk for a given expected return.

43. As the Government Accountability Office stated in its June 2014 Report to the Ranking Member, Committee on Education and the Workforce, House of Representatives, MPT

> is a body of academic and empirical work that focuses on choosing a portfolio, not just its individual parts. Central components include: (1) the concept of diversification—the notion that with a well-chosen group of assets participants may be able to limit their losses and reduce fluctuations of investment returns without sacrificing too much potential gain, and (2) the concept of rebalancing—bringing a participant's portfolio back to an appropriate asset allocation mix—because over time some investments may become misaligned with the participant's investment goals. Rebalancing helps ensure that participant portfolios do not overemphasize one or more asset categories by returning the portfolio to a comfortable level of risk.
>
> U.S. Gov't Accountability Off., GAO-14-310, IMPROVEMENTS CAN BE MADE TO BETTER PROTECT PARTICIPANTS IN MANAGED ACCOUNTS, 16 n.31 (2014).

44. In other words, **it is a basic principle of MPT that the risks associated with an investment must be justified by its potential expected returns in order for that investment to**

[2] The Russell 1000 Growth Index is independently maintained by FTSE Russell 1000, a wholly-owned subsidiary of the London Stock Exchange Group. FTSE Russell 1000 is and has been a leading global provider of benchmarking, analytics, and data solutions for investors for over 20 years. The Russell 1000 Index measures the performance of the 1000 largest U.S. companies in the U.S. stock market. In contrast, the Russell 1000 *Growth Index* measures the performance of a subset of roughly half of the companies comprising the Russell 1000 Index that exhibit relatively more growth characteristics than the other half.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**be rational.** This principle applies even before considering the purpose of the investment or the needs of an investor.

45. MPT is used to provide quantitative metrics to evaluate the performance of investment managers and to provide a rational analysis to determine whether certain investment managers are more likely to achieve a higher expected rate of return for a given amount of risk than others, i.e., outperform other investment managers, or outperform an applicable index.

46. As noted in the Appendix to the March 2024 United States Government Accountability Office Report to Congressional Requesters, some of the most important predictive risk-adjusted MPT metrics that are used to determine the prudence of an investment option include the following:[3]

- Alpha: "A measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta. A positive Alpha indicates the portfolio has performed better than its beta would predict. In contrast, a negative Alpha indicates the portfolio has underperformed, given the expectation established by beta."
- Sharpe Ratio: "A risk-adjusted returns measure developed by William Sharpe. It is calculated over each [time] period by dividing a fund's annualized excess returns by the standard deviation of a fund's annualized excess returns to determine reward per unit of risk. The Sharpe Ratio can be used to compare two funds directly on how much risk each had to bear to earn excess return over the risk-free rate."
- Sortino Ratio: "Similar to the Sharpe ratio, the Sortino Ratio (developed by Frank Sortino) uses only the downside risk portion of the standard deviation in the denominator."

[3] *See* United States Government Accountability Office Report to Congressional Requesters, "401(k) Retirement Plans" March 2024, Accessible Version, page 70-71 of the Report (76-77 of the pdf).



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

47. An additional MPT metric that is most commonly used to evaluate the performance of investment managers, and the prudence of an investment option is the following:

- Information ratio (IR): a metric that helps the investor evaluate whether the manager of the investment is beating a specific benchmark. An IR above 1.0 is evidence of excellent performance with consistent outperformance of the specific benchmark; an IR between 0.5 and 0.99 is evidence of reasonable manager skill; an IR of below 0.5 is evidence of weak performance as compared to the specific benchmark; and a negative value IR is evidence of consistent underperformance relative to the benchmark.

48. Ultimately, maximizing risk-adjusted performance is the primary and most important criteria from an MPT selection and retention perspective, while the actual performance (returns), of an investment is the most important criteria to the plan participant because returns dictate how much money the participant has available for retirement.

49. When evaluating the risk-adjusted performance and quality of investment managers, the minimum standard of care for prudent plan fiduciaries requires the incorporation of standard metrics from MPT.

50. Accordingly, risk-adjusted performance and returns are always considered by prudent fiduciaries when evaluating investment options.

51. Additionally, the Capital Asset Pricing Model[4] ("CAPM") is an investment theory that builds upon the general framework of MPT and is also commonly used and accepted by investment experts.

---

[4] *See, e.g.*, https://corporatefinanceinstitute.com/resources/valuation/what-is-capm-formula/ (last viewed 5.22.26).



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

52. The CAPM provides the following mathematical formula for the principle that the risks associated with an investment must be justified by its potential returns in order for that investment to be rational:

$ERi = Rf + \beta i(Erm - Rf)$, where:

$ERi$ = the expected return of the investment

$Erm$ = the expected return of the market

$Rf$ = the risk-free rate

$\beta i$ = the beta of the investment

$(Erm - Rf)$ = the market risk premium

53. Applied here, the beta—$\beta i$—is the risk associated with an actively managed mutual fund or collective trust, which can be justified only if the expected return—*Eri*—is, at the very least, above that of its benchmark, *Rf*.[5]

54. Accordingly, any suggestion that a comparison of actively managed funds to passively managed investments (as a proxy for the specific market index that the actively managed investment attempts to beat) is somehow inappropriate or an "apples to oranges" comparison ignores the fundamental purpose and design of active mutual funds and is inconsistent with basic investment theory and the prevailing frameworks employed by prudent fiduciaries and advisors to retirement plans.

55. Prudent fiduciaries should—and *must*—compare actively managed funds to passively managed funds or similar indices in order to determine whether a plan is getting the additional return to justify the increased expense and risk of active management. This, in addition to other metrics, is exactly what every minimally competent investment professional

[5] In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation. The APT, another investment analysis framework, likewise dictates the same result.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

does to evaluate an actively managed investment. Arguments or suggestions to the contrary fall far outside mainstream thought in terms of investment management, basic economics, and minimum standards of fiduciary care and prudence.

56. Indeed, in promulgating its Final Rule to Improve Transparency of Fees and Expenses to Workers in 401(k)-Type Retirement Plans in February, 2012, the DOL specifically required that plan sponsors identify benchmarks in the form of an appropriate broad-based securities market index for each investment offered in the plan, thus specifically recognizing that actively managed investments must be evaluated against indexes, for which passively managed index funds serve as an investable proxy. Performing such a comparative analysis is not merely intended to determine whether a plan would be better served by a passively managed investment, but rather whether an actively managed fund is providing value sufficient to justify its retention.

57. This is not to suggest that active management is inappropriate for use in a retirement plan lineup. It does, however, confirm that plan fiduciaries, as a preliminary matter, must carefully analyze whether an actively managed fund provides value and, if they deem a fund does not provide increased value, they must promptly replace it with another fund that has demonstrated such capabilities or simply replace it with a fund that tracks the appropriate index.

58. An objective application of MPT metrics employed solely in the interest of plan participants is the best investment selection methodology currently available and is the approach that is commonly understood by prudent investment experts to be consistent with ERISA's fiduciary duty to provide retirement benefits to defined contribution plan participants (see more detailed discussion below).



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**C. Large-Cap Growth Funds**

59. Large-cap stocks are typically considered to be the top 70% of US equity market capitalization.[6] Large-Cap *Growth* stocks are typically projected to grow faster than other large-cap stocks.

60. Large-Cap Growth *funds* create portfolios primarily composed of large-cap growth stocks.

61. The typical aim of large-cap growth funds is to provide investors with long-term growth of capital through investments in primarily large capitalization stocks.

62. The principal categories of risk for growth stock funds include market risk, issuer risk, and the risk of investing in growth-oriented stocks.

63. Market risk is the chance that stock prices overall will decline. Stock markets tend to move in cycles, with periods of rising prices and periods of falling prices, so each fund is subject to the risk that the market as a whole will fall.

64. Issuer risk is the chance that prices of, and the income generated by, individual securities of companies held by the fund (e.g., UnitedHealth Group) may decline in response to various factors directly related to the issuers of such securities, including reduced demand for an issuer's goods or services, poor management performance, major litigation, investigations, or other controversies related to the issuer.

65. Investing in growth-oriented stocks also carries risk. In general, such stocks (e.g., Tesla) may experience larger price swings and greater potential for loss than other types of stocks, such as those that are considered value-oriented or those that historically have paid continuous dividends (e.g., 3M Company).

---

[6] See, e.g., Morningstar's Investing Terms and Definitions, https://www.morningstar.com/investing-terms/large-growth.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**D. T. Rowe price Growth Stock Fund.**

66. The self-defined primary investment objective of TRP Growth Stock Fund is to "seek long-term growth of capital . . . by investing primarily in common stocks of well-established growth companies."[7]

67. The TRP Growth Stock Fund is an actively managed fund. In other words, it relies on the professional judgment of a portfolio management team to make decisions about the specific investments within the fund.

68. According to TRP, the TRP Growth Stock Fund typically invests at least 80% of its assets in stocks with growth characteristics. Specifically, "the fund generally seeks investments in stocks of large-cap companies with one or more of the following characteristics: strong cash flow and an above-average rate of earnings growth; the ability to sustain earnings momentum during economic downturns; and occupation of a lucrative niche in the economy and the ability to expand even during time of slow economic growth."[8]

69. The TRP Growth Stock Fund is considered by Morningstar[9] to be in the "Large Growth" Category and Morningstar also considers the TRP Growth Stock Fund's Investment Style to be "Large Growth."[10]

70. As of December 31, 2025, TRP compared the performance of the TRP Growth Stock Fund to the performance of both the Russell 1000 Growth Index and the Russell 3000 Index and in its Fact Sheet for the TRP Growth Stock Trusts compares the performance of the TRP Growth Stock Fund to the Russell 1000 Growth Index.

71. Accordingly, a potential reward of investing in the TRP Growth Stock Fund is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

---

[7] *See, e.g.*, https://www.troweprice.com/financial-intermediary/us/en/investments/mutual-funds/us-products/growth-stock-fund.html (Fact Sheet, last visited May 12, 2026).

[8] *Id*.

[9] As noted by the United States Government Accountability Office, "Morningstar is a financial services firm that provides data on mutual funds, collective investment trusts, and other investments." GAO Report to Congressional Requesters, GAO-24-105364, 2 n.2 (Accessible Version).

[10] *See* https://www.morningstar.com/funds/xnas/prgfx/quote



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**TRP GROWTH STOCK FUND SYSTEMICALLY AND SUBSTANTIALLY UNDERPERFORMED ITS OWN BENCHMARK DURING THE CLASS PERIOD**

72. The methodologies employed by careful and prudent fiduciaries are designed to utilize MPT and CAPM to select a diversified menu of investment options that can be used to create a risk/reward profile that can meet the needs of any hypothetical plan participant. It may be rational and prudent to include riskier investments, but only if that risk carries with it a potential for a higher reward, i.e., an outsized return exceeding the return of a comparable risk-free (or lower-risk) option.

73. Index comparisons, as described above, are also particularly important in the efficient U.S. large cap space. Prudent fiduciaries are concerned with actively managed funds' ability to add value in excess of the benchmark, particularly with the domestic large cap strategies.

74. To that end, to measure the value added or subtracted by a portfolio manager, prudent fiduciaries and investment professionals scrutinize a fund's alpha, defined by Morningstar as a measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta. This risk is the risk of the relevant market index. A positive alpha indicates that the portfolio has performed better than its beta would predict; a negative alpha indicates the fund has underperformed expectations based on the risk assumed. Said more simply, alpha represents the return on an investment that is not attributable to the movement of the market.

75. As described below, under MPT and CAPM incorporated into the standard of care under the circumstances prevailing prior to and throughout the Class Period, the Vanguard Russell 1000 Growth Index Fund represents an investable benchmark that is required to be compared with actively managed large cap growth investment options to evaluate whether it is rational to select or retain a particular actively managed large cap growth investment option.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

76. These facts make the Russell 1000 Growth Index a meaningful comparator in the context of evaluating the prudence of TRP Growth Stock Fund under the circumstances prevailing prior to and throughout the Class Period.

77. In fact, as noted above, T. Rowe Price's own published fund fact sheet for the TRP Growth Stock Fund lists the Russell 1000 Growth Index as its appropriate benchmark.

78. These facts also make the Russell 1000 Growth Index the most appropriate index to use in the context of the calculation and evaluation of the investment performance metrics to determine whether any particular investment option, such as the TRP Growth Stock Fund, is prudent under the circumstances prevailing prior to and throughout the Class Period.

79. Well prior to and throughout the Class Period the TRP Growth Stock Fund failed to outperform the Russell 1000 Growth Index and consistently offered a *lower* return for a *higher* degree of risk—the precise opposite of what any prudent and careful fiduciary would seek.

80. Based on the information available to the Plan Fiduciaries with respect to TRP Growth Stock Fund performance against its index benchmark, a plan fiduciary following the minimum standard of care for prudence, when evaluating whether to continue to retain the TRP Growth Stock Fund would have determined that it violated bedrock investment principles sometime around 2019-2020.

81. Any prudent fiduciary exercising prudent monitoring of its menu of investment options would have noticed that the TRP Growth Stock Fund's consistent underperformance was causing damage to Plan participants.

82. Fiduciaries following a prudent process in monitoring this investment would have recognized this underperformance and not have ignored TRP Growth Stock Fund's shortcomings against its applicable index benchmark.

83. TRP Growth Stock Fund's violation of a bedrock investment principle—that higher risks require a higher return—would have been cause to act for any prudent fiduciary.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

84. If the Fiduciaries had engaged in appropriate monitoring, they would have placed this fund on watch sometime prior to or at the start of the Class Period.

85. Defendants' failure to notice or act upon the TRP Growth Stock Fund's underperformance of its own index benchmark alone is cause enough to infer imprudent process.

86. In fact, however, prudent fiduciaries following the standard of care followed by investment experts would have also evaluated the TRP Growth Stock Fund against similar actively managed investment options as well. As described below, a prudent fiduciary following that process would have determined that the TRP Growth Stock Fund needed to be removed and replaced at some point in 2019-2020.

**TRP Growth Stock Fund Has Similar Aims, Risks, and Rewards as the Comparator Funds**

87. Like other large-cap growth funds, the TRP Growth Stock Fund's primary risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

88. The TRP Growth Stock Fund is not the only large-cap growth fund on the market with a substantially similar mix of aims, risks, and potential rewards as described above. As shown below, numerous substantially similar funds / substitutes have existed prior to and throughout the Class Period. The TRP Growth Stock Fund dramatically and consistently underperformed its benchmark and several meaningful substitutes across a wide range of commonly and prudently utilized metrics.

89. Accordingly, all the investment options described below would be included by a prudent fiduciary in the peer consideration set in 2019 and 2020 for both benchmarking the TRP Growth Stock Fund as well as serving as potential replacements for the TRP Growth Stock Fund in the event it needed to be replaced.

90. Moreover, prudent fiduciaries would evaluate the performance of TRP Growth Stock Fund in comparison to the alternative comparable substitute investment options and benchmarks described below.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

91. As a result, the following investment strategies/investment managers[11] are and have been both meaningful benchmarks as well as potential replacements for the TRP Growth Stock Fund prior to and throughout the Class Period. Similarly, the index listed below is and has been a meaningful benchmark to evaluate the performance of the investment managers of the TRP Growth Stock Fund prior to and throughout the Class Period:

a. Alger Focus Equity Strategy

b. Fidelity Blue Chip Growth Strategy

c. JP Morgan Growth Advantage Strategy

d. Putnam Large Cap Growth Strategy

e. Vanguard Russell 1000 Growth Index

f. Russell 1000 Growth Index

92. Each of these comparable benchmarks and investable substitutes set forth above and below share the same aims, risks, potential rewards, goals, and objectives and are categorized identically by Morningstar under the following portfolio criteria: 1) Morningstar Category Broad Group ("Equity"); 2) Morningstar Category Group ("Equity"); 3) Morningstar Category ("US Fund Large Growth"); 4) Morningstar Global Category ("US Equity Large Cap Growth"); 5) US Category Group ("U.S. Equity") 6) Morningstar Equity Style Box (Long) ("Large Growth"); 7) Morningstar Category Index ("Russell 1000 Growth TR USD"); 8) Morningstar Index ("Morningstar US LM Brd Growth TR USD"); 9) S&P Dow Jones Benchmark ("DJ US Total Stock Market Growth TR USD"); and 10) FTSE/Russell Benchmark ("Russell 1000 Growth TR USD").

93. Additionally, because the investment strategies and aims of each of the comparable benchmarks and investable substitutes set forth below are designed to focus on large growth stocks, they are each required to share very similar asset allocations and, in fact, have had very similar asset allocations prior to and throughout the Class Period.

---

[11] Following the process utilized by prudent fiduciaries and investment experts prior to and throughout the Class Period, any investment performance metric comparisons and other comparative metrics contained in this Complaint utilize the share class and/or trust that is the most appropriate for comparison in terms of fee rates, investment minimums, and track record (meaning the length of time for which the investment option has available data).



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

94. For example, as of April 30, 2026, each of these funds held more than 73% of their assets in companies that accounted for the top 70% (large stock) of the capitalization of United States stocks and the TRP Growth Stock Fund's allocation towards large stocks is the median among these comparable benchmarks and investable substitutes. Furthermore, the TRP Growth Stock Fund and all comparator peers invest the vast majority of their assets in Large Cap securities without diversifying into bonds or fixed income investments. As such their risks, aims, goals, and strategies are aligned and centered on Large Cap opportunities.

95. Prudent fiduciaries would have therefore included each of the comparable alternative substitute investment options when monitoring the TRP Growth Stock Fund and considered each of the investable substitutes identified above as potential replacements.

**Comparator One: Alger Focus Equity Fund Z**

96. The Alger Focus Equity Fund Z ("Alger Growth Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Stock Fund.

97. Like the TRP Growth Stock Fund, the Alger Growth Fund is an actively managed large-cap growth fund.

98. The Alger Growth Fund's aim is to seek long-term growth of capital. Like the TRP Growth Stock Fund, the Alger Growth Fund pursues its aim by investing primarily in large-cap stocks with growth characteristics.

99. Morningstar has identified the Russell 1000 Growth Index as the most appropriate category benchmark index for both the Alger Growth Fund and the TRP Growth Stock Fund.

100. The Alger Growth Fund's potential reward is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

101. Like the TRP Growth Stock Fund, the principal risks of the Alger Growth Fund are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

102. The aims, risks, and potential rewards of the Alger Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' investment strategies and the types and sizes of the stocks the two funds own.

103. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary and/or Investment Consultant (investment expert) would consider the Alger Growth Fund as a substitute for the TRP Growth Stock Fund in the event the TRP Growth Stock Fund needed to be replaced.

104. These facts make the Alger Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**Comparator 2: Fidelity Blue Chip Growth Commingled Pool Class Z**

105. The Fidelity Blue Chip Growth Commingled Pool Class Z ("Fidelity Growth Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Stock Fund.

106. Like the TRP Growth Stock Fund, the Fidelity Growth Fund is an actively managed large-cap growth fund.

107. The Fidelity Growth Fund's aim is to seek long-term growth of capital. Like the TRP Growth Stock Fund, the Fidelity Growth Fund pursues its aim by investing primarily in large-cap stocks with growth characteristics.

108. Morningstar has identified the Russell 1000 Growth Index as the most appropriate category benchmark index for both the Fidelity Growth Fund and the TRP Growth Stock Fund.

109. The Fidelity Growth Fund's potential reward is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

110. Like the TRP Growth Stock Fund, the principal risks of the Fidelity Growth Fund are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

111. The aims, risks, and potential rewards of the Fidelity Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' investment strategies and the types and sizes of the stocks the two funds own.

112. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary and/or Investment Consultant (investment expert) would consider the Fidelity Growth Fund as a substitute for the TRP Growth Stock Fund in the event the TRP Growth Stock Fund needed to be replaced.

113. These facts make the Fidelity Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**Comparator 3: J.P. Morgan Chase Bank Growth Advantage Investment Class (CIT)**

114. The J.P. Morgan Chase Bank Growth Advantage Investment Class (CIT) ("JPM Advantage Growth Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Stock Fund.

115. Like the TRP Growth Stock Fund, the JPM Advantage Growth Fund is an actively managed large-cap growth fund.

116. The JPM Advantage Growth Fund's aim is to seek long-term growth of capital. Like the TRP Growth Stock Fund, the JPM Advantage Growth Fund pursues its aim by investing primarily in large-cap stocks with growth characteristics.

117. Morningstar has identified the Russell 1000 Growth Index as the most appropriate category benchmark index for both the JPM Advantage Growth Fund and the TRP Growth Stock Fund.

118. The JPM Advantage Growth Fund's potential reward is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

119. Like the TRP Growth Stock Fund, the principal risks of the JPM Advantage Growth Fund are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

120. The aims, risks, and potential rewards of the JPM Advantage Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' investment strategies and the types and sizes of the stocks the two funds own.

121. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary and/or Investment Consultant (investment expert) would consider the JPM Advantage Growth Fund as a substitute for the TRP Growth Stock Fund in the event the TRP Growth Stock Fund needed to be replaced.

122. These facts make the JPM Advantage Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**Comparator 4: Putnam Large Cap Growth Fund R6**

123. The Putnam Large Cap Growth Fund R6 ("Putnam Growth Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Stock Fund.

124. Like the TRP Growth Stock Fund, the Putnam Growth Fund is an actively managed large-cap growth fund.

125. The Putnam Growth Fund's aim is to seek long-term growth of capital. Like the TRP Growth Stock Fund, the Putnam Growth Fund pursues its aim by investing primarily in large-cap stocks with growth characteristics.

126. Morningstar has identified the Russell 1000 Growth Index as the most appropriate category benchmark index for both the Putnam Growth Fund and the TRP Growth Stock Fund.

127. The Putnam Growth Fund's potential reward is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

128. Like the TRP Growth Stock Fund, the principal risks of the Putnam Growth Fund are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

129. The aims, risks, and potential rewards of the Putnam Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' investment strategies and the types and sizes of the stocks the two funds own.

130. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary and/or Investment Consultant (investment expert) would consider the Putnam Growth Fund as a substitute for the TRP Growth Stock Fund in the event the TRP Growth Stock Fund needed to be replaced.

131. These facts make the Putnam Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**Comparator 5: Vanguard Russell 1000 Growth Index Fund**

132. The Vanguard Russell 1000 Growth Index Fund ("Vanguard Growth Fund") is a passively managed index fund that seeks to track the performance of the Russell 1000 Growth Index. The Vanguard Growth Fund tracks the Russell 1000 Growth Index by investing its assets in the large-cap growth stocks that make up the Russell 1000 Growth Index.

133. The Vanguard Growth Fund has similar aims, risks, and potential rewards as the TRP Growth Stock Fund because it tracks TRP Growth Stock Fund's index benchmark.

134. The Vanguard Growth Fund's potential reward is that it will generate investment returns in line with the Russell 1000 index.

135. Like the TRP Growth Stock Fund, the principal risks of the Vanguard Growth Fund are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

136. The aims, risks, and potential rewards of the Vanguard Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' aims, investment strategies, and the types and sizes of the stocks the two funds own.

137. As described above, under MPT and CAPM incorporated into the standard of care and circumstances prevailing prior to and throughout the Class Period, the Vanguard



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Russell 1000 Growth Index Fund represents an investable benchmark that is required to be compared with actively managed large cap growth investment options to evaluate whether it is rational to select or retain a particular actively managed large cap growth investment option.

138. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary and/or Investment Consultant (investment expert) would consider the Vanguard Russell 1000 Growth Index Fund as a substitute for the TRP Growth Stock Fund in the event the TRP Growth Stock Fund needed to be replaced.

139. These facts make the Vanguard Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**Comparator 6: Russell 1000 Growth Index**

140. As noted above, TRP discloses to the investing public that the Russell 1000 Growth Index is an investment performance benchmark for the TRP Growth Stock Fund and that the Russell 1000 Growth Index is an index that closely aligns with the fund's investment strategy.

141. That means that TRP and the investment manager of the TRP Growth Stock Fund have both necessarily concluded that the TRP Growth Stock Fund and the Russell 1000 Growth Index share similar investment characteristics and, in fact, the prospectus and/or Fact Sheets explicitly compare the performance of the TRP Growth Stock Fund to that of the Russell 1000 Growth Index. Thus, the Russell 1000 Growth Index is a meaningful benchmark for the TRP Growth Stock Fund.

142. The 1000 Growth Index measures the performance of the large-cap growth segment of the U.S. stock market. It includes companies that are similar to the companies included in the TRP Growth Stock Fund.

143. Investors can own the Russell 1000 Growth Index by investing in investment options that own all or substantially all the stocks represented in the Russell 1000 Growth Index such as, e.g., the Vanguard Russell 1000 Growth Index Fund discussed above.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

144. By virtue of the similarities in their investment strategies, respective market capitalizations, and risk profiles, the Russell 1000 Growth Index and the TRP Growth Stock Fund share similar aims, rewards, and levels or risks.

145. As described above, under MPT and CAPM incorporated into the standard of care and circumstances prevailing prior to and throughout the Class Period, the Vanguard Russell 1000 Growth Index Fund represents an investable benchmark that is required to be compared with actively managed large cap growth investment options to evaluate whether it is rational to select or retain a particular actively managed large cap growth investment option.

146. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary and/or Investment Consultant (investment expert) would compare and benchmark the performance of the TRP Growth Stock Fund to the Russell 1000 Growth Index.

147. These facts make the Russell 1000 Growth Index a meaningful comparator in the context of evaluating the prudence of TRP Growth Stock Fund under the circumstances prevailing prior to and throughout the Class Period.

148. These facts also make the Russell 1000 index the most appropriate index to use in the context of the calculation and evaluation of the investment performance metrics to determine whether any particular investment option, such as the TRP Growth Stock Fund, is prudent under the circumstances prevailing prior to and throughout the Class Period.

**The TRP Growth Stock Fund Underperformed the Peer Comparators**

149. Poor investment performance can seriously diminish a participant's retirement savings. An investment option that underperforms by even a half a percent annually has a material impact on a participant's retirement savings, particularly over the course of a multi-decade working career.

150. Under the circumstances prevailing prior to and throughout the Class Period, fiduciaries following a prudent process selecting and monitoring large growth investment options made available to defined contribution plan participants would have evaluated the



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

following commonly accepted MPT investment metrics which clearly demonstrated the TRP Growth Stock Fund should have been removed and replaced prior to the Class Period.

151. The TRP Growth Stock Fund's severe and consistent underperformance, illustrated in the tables below, raises a plausible inference that the TRP Growth Stock Fund could not have been determined to be prudent by any reasonably attentive fiduciaries during the Class Period.

152. Moreover, the TRP Growth Stock Fund's severe underperformance illustrated in the tables below raises a plausible inference that the TRP Growth Stock Fund could not have been expected to provide reasonable investment returns given the risk and therefore was not a prudent investment prior to and throughout the Class Period.

153. The following table illustrates the severe and consistent underperformance of the TRP Growth Stock Fund compared to meaningful comparable benchmarks and alternative options identified above based on widely used and commonly accepted MPT investment performance metrics.

154. Specifically, the table below provides a summary of 3- and 5-year investment returns and MPT investment manager performance metrics compared to the meaningful comparable investable alternatives/substitutes identified above throughout 2018 and 2019 and into the first quarter of 2020.[12] Specifically, at year-end 2019 and 2020, the TRP Growth Stock Fund had underperformed 97% of a set of significant MPT investment manager metrics over 3- and 5-year periods.

[12] The details of the underlying data and calculations are set forth in Appendix A.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**Performance Metrics Comparison Summary January 2019 - December 2020**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics Underperformed | Percentage of Metrics Underperformed |
|---|---|---|---|
| 3 - Year Return | 10 | 10 | 100% |
| 5 - Year Return | 9 | 9 | 100% |
| Sharpe Ratio - 3 - Year | 10 | 10 | 100% |
| Sharpe Ratio - 5 - Year | 9 | 9 | 100% |
| Information Ratio 3 - Year | 8 | 8 | 100% |
| Information Ratio 5 - Year | 7 | 7 | 100% |
| Alpha 3 - Year | 8 | 8 | 100% |
| Alpha 5 - Year | 7 | 7 | 100% |
| Sortino Ratio - 3 - Year | 10 | 8 | 80% |
| Sortino Ratio - 5 - Year | 9 | 8 | 89% |
| **Total** | **87** | **84** | **97%** |

155. The table below shows the steadily worsening underperformance of the MPT investment metrics of the TRP Growth Stock Fund compared to the meaningful comparable investable alternatives/substitutes/benchmarks identified above throughout the Class Period.[13]

**Performance Metrics Comparison Summary January 2021 - December 2025**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics Underperformed | Percentage of Metrics Underperformed |
|---|---|---|---|
| 3 - Year Return | 25 | 24 | 96% |
| 5 - Year Return | 25 | 25 | 100% |
| Sharpe Ratio - 3 - Year | 25 | 23 | 92% |
| Sharpe Ratio - 5 - Year | 25 | 25 | 100% |
| Information Ratio 3 - Year | 20 | 18 | 90% |
| Information Ratio 5 - Year | 20 | 20 | 100% |
| Alpha 3 - Year | 20 | 18 | 90% |
| Alpha 5 - Year | 20 | 20 | 100% |
| Sortino Ratio - 3 - Year | 25 | 23 | 92% |
| Sortino Ratio - 5 - Year | 25 | 25 | 100% |
| **Total** | **230** | **221** | **96%** |

[13] The details of the underlying data and calculations are set forth in Appendix A.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

156. Moreover, by any prudent combination and weighting of investment performance metrics employed by prudent investment experts and prudent fiduciaries, by Q3 2019 the TRP Growth Stock Fund failed to pass the minimum screens required to be retained in an investment lineup (the minimum requirements would require outperforming more than a minimum of 50% of a comparable peer group among a set of MPT metrics similar to those illustrated above and then achieving a minimum of a weighted 50% score based on a weighted pass/fail result of the underlying metrics).

157. For example, by Q3 2019, the TRP Growth Stock Fund failed to perform in the highest 50% of a set of comparable/alternative substitutes funds (Morningstar's universe of Large Growth Collective Trusts) for some of the most important (highest weighted) MPT metrics, i.e., 3-Year Sharpe, 5-Year Sharpe, 3-Year Information Ratio, 5-Year Alpha, and 3-Year Treynor Ratio.

158. Moreover, by the end of Q1 2020, the TRP Growth Stock Fund failed to perform in the top 50% of Morningstar's universe of Large Growth Collective Trusts, when evaluated by most important MPT metrics, i.e., the 3 and 5-Year Sharpe Ratio, the 3 and 5-Year Information Ratio, the 3 and 5-Year Sortino Ratio, the 3 and 5-Year Alpha, and the 3 and 5-Year Traynor Ratio. Every one of these failures continued for three more consecutive quarters through Q4 of 2020.

159. Under the standard of care utilized by investment experts under the circumstances prevailing prior to and throughout the Class Period, a fund that failed to perform in the top 50% for more than 50% of the MPT metrics over consecutive quarters, like the TRP Growth Stock Fund, would have been removed and replaced by prudent plan fiduciaries.

160. The table below shows the severe underperformance in terms of the returns of the TRP Growth Stock Fund throughout Class Period compared to prudent alternatives and meaningful comparable benchmarks which approximately represents the losses suffered by Plan participants as a direct result of the Plan fiduciaries' imprudent retention of the TRP Growth Stock Fund throughout the Class Period. These are among the alternative substitutes


TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

that would have been selected by prudent fiduciaries and investment experts had they removed the TRP Growth Stock Fund.

**Approximate Performance Losses and Metrics January 1, 2020 to December 31, 2025**

| Investment Name | Total # of Metrics Analyzed | # of Metrics Underperformed | Percentage of Metrics Underperformed | Performance Losses ($) vs. Comparators |
|---|---|---|---|---|
| Alger Focus Equity Z | 60 | 60 | 100% | -$318,690,751 |
| Fidelity BlueChip Growth Commingled Pl Z | 60 | 60 | 100% | -$251,250,821 |
| JPMCB Growth Advantage Inv | 60 | 55 | 92% | -$180,059,026 |
| Putnam Large Cap Growth R6 | 60 | 56 | 93% | -$113,974,743 |
| The Vanguard Russell 1000 Growth Index | 36 | 36 | 100% | -$157,920,341 |
| **T. Rowe Price Growth Stock Tr-C Aggregate Summary** | **276** | **267** | **97%** | |

161. In summary, Defendants retained the TRP Growth Stock Fund prior to and throughout the Class Period despite readily available information (available both prior to and throughout the Class Period) which indicated dramatically inferior investment returns as well as dramatically inferior performance on MPT investment manager and risk adjusted metrics.

162. In other words, examining the information available to the Plan Fiduciaries in 2020, a plan fiduciary following the minimum standard of care for prudence, when evaluating whether to continue to retain the TRP Growth Stock Fund would have determined that its investment performance was inferior and its risk-adjusted performance was severely inferior under commonly accepted MPT investment metrics and thus removed the TRP Growth Stock Fund by early 2020, at the latest.

163. In summary, prior to and throughout the Class Period, when evaluated by investment experts under the circumstances prevailing prior to and throughout the Class Period, had the Plan Fiduciaries followed a prudent process they would have seen that the TRP Growth Stock fund failed to pass the criteria required to be determined to be prudent and would have removed and replaced it with another superior alternative/substitute.

164. As a direct result of this conduct, the Plan participants have suffered investment losses of, at a minimum, tens of millions of dollars.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

165. A prudent fiduciary would have in place a process of investigating and monitoring all plan funds, relative to their comparators and benchmarks, over a 3-year and 5-year period. A prudent fiduciary would put in place, and regularly carry out, a process in which consistently underperforming funds were removed from the list of investment options and replaced with prudent alternative/substitutes.

166. Any prudent fiduciary exercising reasonable and careful stewardship over the Plan, and its menu of investment options, would have noticed that the TRP Growth Stock Fund's consistent underperformance was causing catastrophic damages to the Plan participants.

167. Defendants either did not notice this ongoing underperformance or noticed but did not care. Either way, this continuing inaction is the result of an unreasonable and imprudent process and constitutes a breach of fiduciary duty which caused real and ongoing harm to Plaintiff and other Plan participants.

168. In summary, Defendants' failure to have in place adequate processes to promptly remove and replace the TRP Growth Stock Fund from the Plan's investment menu caused the Plan participants tens of millions of dollars in lost earnings over the Class Period.

## V. FACTUAL ALLEGATIONS APPLICABLE TO CLAIMS 3-8

### A. The Company's Plan Fiduciaries' Use of Forfeited Plan Assets During the Class Period

169. The Plan's Summary Plan Description specifically sets forth how Forfeited Plan Assets shall be used as follows in Section V(B):

> Forfeitures are retained in the Plan and may first be used to pay administrative expenses. Any remaining amounts will be used to reduce future Employer contributions payable under the Plan.

170. The Plan's Form 5500s, along with independently audited financial statements, are required to be filed with the Department of Labor for each Plan year and are publicly available. The Plan's Form 5500s for a given plan year are typically filed in the fall of the next calendar year.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

171. These filings typically detail the amount of Non-Discretionary Matching Employer Contributions, the amount of Forfeited Plan Assets used to offset Company's Non-Discretionary Matching Employer Contributions, and the amount of Forfeited Plan Assets used to defray Plan Expenses.

172. Unlike most other companies, however, Company failed to indicate the portion of Forfeited Plan Assets that was used each year to offset Company Contributions as opposed to defraying Plan expenses. From 2020 through at least 2025[14], however, in its Form 5500 financial statements Company did disclose that Participants are assessed a quarterly administrative fee and that the Plan's recordkeeper was paid over $10M in compensation from Plan assets.

173. Additionally, in its August 2026 Fee Disclosure to Plan participants, Defendants disclosed that the Plan's Recordkeeping Fee was $25 per year deducted [from the accounts of Plan participants] quarterly. This is also validated in Plaintiff's statement covering 01/01/2026 to 08/13/2026 which indicates "Administrative Fees" of $18.75 had been deducted from Plaintiff's account, i.e., three quarterly deductions of $6.25 (one quarter of the annual fee of $25). Therefore, Plaintiff has suffered an actual injury.

174. From 2020 through 2025, Company was required under the terms of the Plan to make Non-Discretionary Matching Employer Contributions to the Plan and Plan participants in the following amounts: (1) in 2020, at least $130,175,359[15]; (2) in 2022, at least $190,929,862; (3) in 2023, at least $181,033,570; and (4) in 2024, at least $167,364,416.

175. From 2020 through 2025, the Company Plan Fiduciaries were required under the terms of the Plan and ERISA to direct the use of at least $7M in Forfeited Plan Assets.

176. From 2020 through 2025, the Company Plan Fiduciaries used Forfeited Plan Assets to offset Company's obligation to make Non-Discretionary Matching Employer

---

[14] Company failed to include the Plan's financial statements as required when they filed the Plan's Form 5500 for 2021.

[15] Derived from the Plan's 2019-2024 Forms 5500s. For example, in 2019, Company disclosed that it made $130,175,359 in Non-Discretionary Matching Employer contributions.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Contributions instead of allocating Forfeited Plan Assets in the best interest of Plan participants to defray Plan expenses.

177. Upon information and belief, the Company Plan Fiduciaries have continued to violate ERISA in their use of Forfeited Plan Assets.

178. Well prior to the Class Period, like all prudent defined contribution plan fiduciaries and plan sponsor/employers/settlors, the Company Plan Fiduciaries knew that a defined contribution "plan will not be qualified unless all funds are allocated to participants' accounts in accordance with a definite formula in the plan." *See also*, IRS "Retirement News for Employers," Vol. 7, at 4, Spring 2010 (citing to IRS Revenue Ruling 80–155).

179. Similarly, all prudent defined contribution plan fiduciaries and employers knew that to ensure their plans remained qualified under the IRS Code, there were only a few allowable uses of Forfeited Plan Assets, primary among them being to defray plan expenses or reduce employer contributions. *Id*.

180. Accordingly, when designing their plan, employers had a few limited options to choose from with respect to the treatment of Forfeited Plan Assets. Employers that wanted all Forfeited Plan Assets to be used first to reduce employer contributions prior to defraying plan expenses could have drafted the terms of the plan to explicitly require that (as some did).

181. Indeed, during the Class Period, several other large plan sponsors drafted their plans to specifically require Forfeited Plan Assets to be used to offset the employer's matching and discretionary contributions before being used to defray plan expenses, while others even prohibited using Forfeited Plan Assets to defray plan expenses.

182. On the opposite end of the spectrum, some plans preclude or limit Forfeited Plan Assets from being used to reduce employer contributions.

183. Thus, it is possible that the Plan requires Forfeited Plan Assets to be used first to defray Plan expenses with remaining amounts available to offset Company contributions.

184. Alternatively, the Plan may grant discretion to the Plan fiduciaries to determine whether to allocate Forfeited Plan Assets to defray Plan expenses.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

185. Accordingly, there can be no dispute that under the terms of the Plan, defraying Plan Expenses is an allowable use of Forfeited Plan Assets.

186. Regardless of the specific provisions of the Plan or whether the terms are ambiguous, Defendants breached their duties of prudence and loyalty when they chose to require participants to pay Plan expenses directly from their accounts when Forfeited Plan Assets were available to defray Plan expenses.

187. Under the circumstances prevailing prior to and throughout the Class Period, Plan Fiduciaries should have understood the duty of loyalty to require plan fiduciaries to act in the "best interest" of plan participants.

188. When exercising discretion with respect to how to allocate Plan expenses, the Plan Fiduciaries were required to wear only their fiduciary hat and be guided by ERISA's requirement that the determination would be made *solely* in the interest of the Plan participants and for the *exclusive* purpose of providing benefits *and* defraying plan expenses. *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

189. There can be no dispute that it would be in the best interest of the Plan participants for the Plan's fiduciaries to allocate Forfeited Plan Assets to defray Plan expenses. In other words, the account balances of Plan participants would be greater if the Plan fiduciaries allocated Forfeited Plan Assets to defray Plan expenses than if the Plan fiduciaries instead used the Forfeited Plan Assets to offset Company contributions.

190. If the Plan document does, in fact, grant discretion to the Plan fiduciaries to allocate Forfeited Plan Assets, then when the Plan fiduciaries exercised that discretion to offset Company contributions instead of defraying Plan expenses, the Plan fiduciaries were faced with a conflict of interest and, contrary to the duty of loyalty, acted in the best interest of Company instead of Plan participants.

191. When a plan document, as here, allows Forfeited Plan Assets to be used to defray Plan expenses, a prudent independent and non-conflicted Plan Fiduciary would have no reason to fail to use Forfeited Plan Assets to defray plan expenses.


TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

192. Similarly, if the terms of the Plan require the Plan Fiduciaries to exercise discretion related to the use of Forfeited Plan Assets, the Plan fiduciaries were required to exercise that discretion prudently.

193. Accordingly, throughout the entire Class Period, a prudent fiduciary as part of a prudent fiduciary process would have always considered whether using Forfeited Plan Assets to defray Plan Expenses was more consistent with their duties under the plan and ERISA than using Forfeited Plan Assets to offset Non-Discretionary Matching Employer Contributions. As set forth in detail below, the facts and circumstances here support a finding that, throughout the Class Period, a prudent fiduciary of the Plan, employing a prudent process would have chosen to use Forfeited Plan Assets to defray substantially all Plan Expenses during the Class Period.

194. Prudent Plan fiduciaries would investigate alternatives and preferences set forth in the Plan to determine how the Plan Expenses would be paid and how to direct the use of Forfeited Plan Assets consistent with ERISA and the terms of the Plan.

195. It is important to note that a plan fiduciary that exercises discretion to use Forfeited Plan Assets to defray plan expenses is not providing a benefit greater than what was required or intended by the plan sponsor/employer (settlor). Rather, plans that grant discretion to plan fiduciaries to choose among multiple different options for allocating Forfeited Plan Assets, including to defray plan expenses, necessarily contemplate that plan expenses will be defrayed if doing so accords with ERISA's fiduciary standards. As noted above, employers were always aware that they could design the plan to prevent the use of Forfeited Plan Asset to defray plan expenses.[16]

196. There is no set of facts or circumstances that would make the Plan fiduciaries' decision to use Forfeited Plan Assets to offset Company contributions instead of defraying Plan expenses prudent.

[16] It is worth noting that it is a settlor function to decide whether or not to provide a discretionary match (unconstrained by any fiduciary duties to plan participants) whereas decisions regarding the use of forfeited plan assets are constrained by ERISA's fiduciary duties.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**B. The Company Plan Fiduciaries' Breaches of the Duty of Prudence**

197. Even if the Plan may be interpreted to provide discretion on the use of Forfeited Plan Assets, ERISA's fiduciary duty of prudence is violated where, as here, first the Company Plan Fiduciaries were required to determine how to allocate Plan Expenses to the Plan when the use of Forfeited Plan Assets is among the available options. As a result, the Company Plan Fiduciaries were faced with a decision each year in choosing between allocating Forfeited Plan Assets toward offsetting Non-Discretionary Matching Employer Contributions or defraying Plan Expenses that would otherwise be borne by Plan participants. By failing to conduct any investigation as to which choice would be in the best interest of the participants, the Plan Fiduciaries decided to allocate virtually all Plan Expenses to Plan participants despite there being no dispute that using Forfeited Plan Assets to defray Plan Expenses was the decision that would be consistent with a duty to discharge their duties solely in the interest of Plan participants for the exclusive purpose of defraying Plan Expenses and providing retirement benefits to Plan participants.

198. If the Company Plan Fiduciaries had employed a prudent process every year immediately prior to and throughout the Class Period, the Company Plan Fiduciaries would have used the Forfeited Plan Assets to defray all or substantial amounts of Plan Expenses.[17]

199. Upon information and belief, however, the Company Plan Fiduciaries allocated hardly any, if any at all, of the Forfeited Plan Assets to defray Plan Expenses. For example, direct compensation paid to Fidelity never comprised less than 84% of the total direct compensation paid by the Plan for any year during the Class Period and those amounts were deducted from the accounts of Plan participants for at least a portion of the Class Period.

---

[17] In other words, to the extent that the Forfeited Plan Assets exceeded the foreseeable future ongoing Plan Expenses of the Plan as evaluated *solely* in the interest of Plan participants and for the *exclusive* purpose of providing benefits to participants *and* defraying the Plan Expenses of the Plan, then the Forfeited Plan Assets could have been used to defray a significant amount of the Plan's expenses while also offsetting a portion of Company's Non-discretionary Company Matching Contributions. Defendants are solely in the possession of the documents that would be necessary to review and evaluate the Fiduciaries' determination not to use Forfeited Plan Assets to defray Plan expenses.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

200. Because the Company Plan Fiduciaries always had the ability to defray Plan Expenses with Forfeited Plan Assets but failed to do so, it is reasonable to infer that the Company Plan Fiduciaries employed a flawed decision-making process or did not employ any process at all to determine how to allocate Forfeited Plan Assets.

201. Consequently, an objective analysis of the available options throughout the Class Period, guided by ERISA's fiduciary duty of prudence would indisputably not result in Plan Fiduciaries choosing to use nearly all Forfeited Plan Assets available to offset future Non-Discretionary Matching Employer Contributions year after year throughout the Class Period instead of using Forfeited Plan Assets to defray some or all Plan Expenses.

202. Instead of acting prudently by using Forfeited Plan Assets to defray Plan Expenses charged to the individual accounts of Plan participants on an ongoing basis, upon information and belief the Company Plan Fiduciaries chose to use virtually all the Forfeited Plan Assets for the purpose of offsetting Company's Non-Discretionary Matching Employer Contributions to the Plan, thereby saving Company millions of dollars at the expense of the Plan.

203. Prudent fiduciaries following a prudent process would not choose to offset Company's Non-Discretionary Employer Matching Contributions instead of reducing the Plan participants' Plan Expenses.

204. The Company Plan Fiduciaries' conduct, at the very least, necessitates the inference that either it did not have processes in place to weigh the benefits to participants of allocating Forfeited Plan Assets or, alternatively, the process employed was fatally flawed.

**C. The Company Plan Fiduciaries' Breaches of the Duty of Loyalty.**

205. Throughout the Class Period loyal fiduciaries were required to make decisions with respect to the allocation of Forfeited Plan Assets, "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

206. As discussed above, the Company Plan Fiduciaries made the fiduciary decision to allocate Plan Expenses to the accounts of Company Plan participants (or cause the use of indirect compensation to reduce the value of the accounts of Plan participants).

207. As a result, upon information and belief, at most the Company only used a tiny fraction of Forfeited Plan Assets to defray the Plan's Expenses. For example, in 2023 and 2024 the minimum amounts that appear to have been deducted from the accounts of Plan participants (i.e., $25 annually) comprise over 88% of the direct compensation paid to service providers from the Plan. Based on the information provided in Defendant's Form 5500s and Participant Fee Disclosure document, Plan participants also paid indirect compensation to the Plan's recordkeeper and thus the amount of direct compensation Defendants have disclosed understates the total compensation paid to the Plan's recordkeeper indirectly from the accounts of Plan participants or from other unallocated Plan accounts that are often funded from a reduction in the value of the investments held by Plan participants.

208. Using Forfeited Plan Assets to reduce current and future employer contributions is always in the best interest of Company because that option decreases Company's own contribution costs and means that Company does not need to take money out of its own general revenues to pay for Non-Discretionary Employer Matching Contributions.

209. In deciding between using the Forfeited Plan Assets to benefit Company or Plan participants, Company Plan Fiduciaries are presented with a conflict of interest in administering the Plan and managing and disposing of their assets.

210. In using Forfeited Plan Assets almost exclusively to reduce its own employer contributions from 2019-2024, even though it was permitted (and arguably, required) to use those Forfeited Plan Assets to defray Plan Expenses for participants, Company, while acting in its fiduciary capacity as Plan Fiduciaries, was motivated solely by its settlor/employer self-interest and breached their duty of loyalty.

211. To be clear, as described above, Plaintiff does not allege that ERISA prohibits fiduciaries from *ever* using Forfeited Plan Assets to offset company contributions. Rather,



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Plaintiff alleges that under the specific facts and context of this Plan—where the Company Plan Fiduciaries were accorded discretion by the Plan over how to allocate Forfeited Plan Assets—a prudent and loyal fiduciary would not make the decisions that the Company Plan Fiduciaries made (as alleged above).

212. In fact, had the Plan Fiduciaries acted prudently and loyally throughout the Class Period, the Plan Fiduciaries should have used Forfeited Plan Assets to defray substantially all Plan Expenses and then still would have been able to allocate a significant portion in some years to offset the Non-Discretionary Matching Employer Contributions.

213. In summary, the totality of the specific facts and circumstances of the Plan and the conduct of the Company Plan Fiduciaries throughout the Class Period demonstrates that the Company Plan Fiduciaries failed to administer the Plan in a prudent and loyal manner.

**D. Transactions Prohibited by ERISA**

214. ERISA's prohibited-transaction provisions impose "categorical" restrictions designed to protect plan assets from conflicted, insider transactions. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000).

215. Section 406(a) prohibits fiduciaries from causing a plan to engage in certain transactions with parties in interest, including any "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

216. Section 406(b) separately prohibits fiduciaries from "deal[ing] with the assets of the plan in [their] own interest . . . " *id*. § 1106(b)(1), or "act[ing] in any transaction" involving plan assets "on behalf of a party . . . whose interests are adverse to the interests of the plan." *Id*. § 1106(b)(2).

217. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 700 (2025), reinforces that ERISA § 406(a) imposes "categorical" prohibitions on certain transactions and that plaintiffs need only plead the statutory elements of § 406(a)(1) to state a claim.

218. *Cunningham* makes clear that § 1106(a)(1)'s prohibitions apply whenever a fiduciary causes a plan to engage in a transaction falling within the statutory language.



**TERRELL MARSHALL LAW GROUP PLLC**
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Although *Cunningham* did not address the meaning of "use" under § 406(a)(1)(D) or the application of forfeitures to reduce employer contributions, those questions are resolved by the growing body of forfeiture-specific cases, many of which hold that a fiduciary "uses" plan assets for the employer's benefit when it applies forfeitures to reduce employer contributions—even where no funds leave the plan trust.

219. When a fiduciary applies forfeitures in a manner that relieves the employer of a financial obligation, the fiduciary has engaged in a prohibited "use" of plan assets, even without a literal transfer of funds.

220. An employer's reallocation of undisputed plan assets to reduce its own matching contribution is a 'use' of plan assets for the purposes of § 1106(a)(1)(D). This is because allocating forfeitures to reduce employer contributions is not an internal bookkeeping measure—it is a disposition of plan assets that directly benefits the employer.

221. A party in interest includes an employer whose employees are covered by the plan. 29 U.S.C. § 1002(14)(C).

222. Company saved millions of dollars in employer contributions by using forfeitures to satisfy obligations it otherwise would have paid from corporate funds.

223. That is a direct "transfer to" or "use for the benefit of" a party in interest under § 406(a)(1)(D).

224. The allocation of forfeitures to reduce employer contributions necessarily reduces the employer's financial obligation to the Plan. Forfeiture allocation operates "between" the plan and employer because it alters the employer's contribution obligations, violates § 406(a)(1)(D).

225. Similarly, Section 406(b)(1) bars a fiduciary from "deal[ing] with the assets of the plan in his own interest," and § 406(b)(2) prohibits a fiduciary from acting for the benefit of a party adverse to participants. Plaintiff alleges that Company acted in both capacities—first, as fiduciary allocating forfeitures, and second, as employer who benefited directly from that allocation.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

226. A fiduciary breaches § 406(b) when it uses plan assets in a manner that relieves the employer of financial obligations.

227. Because Company's allocation decisions relieved itself of substantial financial obligations while providing no corresponding benefit to Plan participants, prohibited self-dealing exists under § 406(b).

228. Reducing employer contributions is not merely an "intra-plan transfer" and is a "transaction" under § 406.

229. An intra-plan movement of assets constitutes a prohibited transaction if it: (1) involves plan assets; (2) benefits a party in interest or fiduciary; and (3) results from a fiduciary decision.

230. Company caused plan assets to be used to reduce its own contribution obligations. That is "dealing with" and "using" plan assets in a manner § 406 squarely prohibits, and thus, Company engaged in transactions prohibited by both § 406(a) and § 406(b).

**E. Self-Dealing**

231. From 2020 through 2025, the Plan Fiduciaries caused, directed, and authorized tens of thousands of transactions, both directly extracting money from the accounts of Plan participants or indirectly by reducing the net value of investment options held by Participants in the Plan, causing Plan participants to pay around $14.5 million directly for Plan Expenses as well as additional amounts indirectly to the Plan's third-party administrators that should have been covered fully or in part by Forfeited Plan Assets.

232. These direct transactions are memorialized in Plan level accounting, *e.g.*, a trust report of the Plan. In this case the Plan Fiduciaries chose to use a non-transparent fee methodology to cover plan expenses to hide the plan expenses from plan participants by requiring the Plan's Expenses to be paid from the total annual operating expenses of the Plan's investment options. As a result, the Plan Fiduciaries caused the Plan to engage in thousands of transactions that resulted in a portion of the total annual operating expenses of the Plan's investment options to be paid by Plan participants to the managers of the Plan's investment



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

options who, in turn, sent a portion of that revenue back to the Plan to be held in a plan level account and used to pay the Plan expenses directly (and indirectly as well-see below) to the Plan's service providers.

233. Moreover, throughout at least a portion of the Class Period, Defendants directed and authorized Plan participants to pay an indeterminable amount of indirect compensation for Plan Expenses. The amount of indirect compensation paid by Plan participants to cover Plan Expenses is not able to be calculated by the documents available to Plaintiff and is in the possession of Defendants who have not provided that information to Plaintiff.

234. Had Defendants acted in accordance with the terms of the Plan document and ERISA, Defendants should have directed the use of Forfeited Plan Assets to defray the Plan Expenses that Defendants instead required Plan participants to directly pay through transactions from their individual accounts or indirectly through the operating expense of the investment options in the Plan.

235. Throughout the Class Period, Defendants also caused the Plan to engage in several transactions with Company, a party in interest, related to Company's contractual obligation to make Non-Discretionary Matching Employer Contributions to the Plan. For each of these transactions, the Plan Fiduciaries coordinated with the third-party recordkeeper and Company to calculate how much Company could reduce its obligatory payment to the Plan by offsetting the full amount owed with the use of Forfeited Plan Assets.

236. In each of these instances, Defendants caused the Plan to engage in a transaction with Company that directly resulted in a smaller amount of money being paid by Company into the Plan.

237. In other words, several times throughout the Class Period the Plan Fiduciaries engaged in calculations for the express purpose of calculating how much money Company could save from its contractual obligation to the Plan by using Forfeited Plan Assets to offset the amount of Company's contribution.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

238. As noted above, each of these transactions are also memorialized in the Plan trust reports. Each of these transactions then serves to provide the assets necessary to execute thousands of transactions to invest Non-Discretionary Matching Employer Contributions and Forfeited Plan Assets pursuant to the investment instructions of Plan participants.

239. In other words, each of these transactions involves the receipt of Non-Discretionary Employer Matching Contributions and calculations related to Forfeited Plan Assets to enable a combination of Forfeited Plan Assets and Non-Discretionary Matching Employer Contributions to be combined for use in following the investment instructions of thousands of Plan participants.

240. In other words, during the Class Period, the Plan Fiduciaries engaged in the conduct of making calculations that caused the Plan to receive several million Dollars less in Non-Discretionary Matching Employer Contributions than what Company was obligated to make and which increased Company profits by several million Dollars.

241. Additionally, Defendants caused the Plan to engage in these transactions with Company that constituted and resulted in the use of Forfeited Plan Assets for the direct and indirect benefit of Company, a party in interest and Plan fiduciary.

242. Throughout the Class Period, by directing, authorizing, and causing several transactions with Company and tens of thousands of transactions with Plan participants, Defendants dealt with the Forfeited Plan Assets in their own individual interest and in Company's interest by using Forfeited Plan Assets to offset Company's contractual obligations to the Plan.

243. Throughout the Class Period, by directing, authorizing, and causing several transactions with Company and tens of thousands of transactions with Plan participants, the individual Plan Fiduciaries acted in their individual capacity and as agents of a party in interest, *i.e.*, Company, whose interests are adverse to the Plan or Plan participants.

244. Throughout the Class Period, by directing, authorizing, and causing several transactions with Company and tens of thousands of transactions with Plan participants, the



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

individual Plan Fiduciaries received consideration for their own personal accounts from Company as a result of their control over the transactions described above with a party in interest, *i.e.*, Company, involving the Forfeited Plan Assets, that enabled Company to reduce its costs and increase its profits thereby benefiting each individual Plan Fiduciary.

## VI. CLASS ALLEGATIONS

245. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

246. In acting in his representative capacity for the Plan, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following Class:

> All participants and beneficiaries of the T-Mobile USA, Inc. 401(k) Plan (excluding Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning August 19, 2020, and running through the date of judgment.

247. The Class includes many thousands of members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

248. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as to the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b. Whether Defendants breached their fiduciary duties to the Plan by failing to put in place, and carry out, a reasonable and prudent process for reviewing investment options within the Plan;

c. Whether Plan Fiduciaries breached their fiduciary duties to the Plan with respect to their management and allocation of Plan assets?



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

d. Whether Plan Fiduciaries engaged in prohibited transactions with Plan assets?

e. What are the losses to the Plan resulting from each alleged breach of ERISA?

f. What are the losses to the Plan resulting from each claim against Defendants?

g. What Plan-wide equitable and other relief the Court should impose in light of Defendants' alleged conduct?

249. Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all similarly situated participants in the Plan were harmed by Defendants' misconduct.

250. Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because Plaintiff was a participant in the Plan during the Class Period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

251. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

252. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

253. Plaintiff's counsel has substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

254. The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

255. The claims asserted on behalf of the Plan in this case fall outside the scope of any exhaustion language in the individual participants' Plan.

256. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

257. Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation—such as a requirement to exhaust administrative remedies—does not, by itself, bind the Plan.

258. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances—that the Court should review and where appropriate defer to a Plan administrator's decision—does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

## FIRST CLAIM
## Breach of Duty of Prudence (29 U.S.C. § 1104(a)(1)(B))
## (Against the 401(k) Committee)

259. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

260. At all relevant times, the 401(k) Committee and all individual 401(k) Committee members acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A). Each of these Defendants (i) exercised authority and control with respect to the management of the Plan and its assets; (ii) rendered investment advice for a fee or other compensation, direct or indirect,



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

with respect to Plan assets, or had the authority or responsibility to do so; and (iii) had discretionary authority or discretionary responsibility in the administration of the Plan.

261. Pursuant to 29 U.S.C. § 1104(a)(1)(B), the 401(k) Committee and its individual members were required to discharge their duties to the Plan "solely in the interest of the participants and beneficiaries" and to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

262. The 401(k) Committee and its individual members are and were responsible for investigating, evaluating, and monitoring the Plan's investment options on an ongoing basis, eliminating imprudent investments, and taking all necessary steps to ensure that plan assets were invested prudently.

263. The 401(k) Committee and its individual members breached their fiduciary duties through an imprudent process for investigating, evaluating, and monitoring the Plan's investment options.

264. Throughout the Class Period, the T. Rowe Price Growth Stock Fund was included in the Plan's set of investment options.

265. A reasonably prudent fiduciary, following a reasonably prudent process, would have removed and not retained the T. Rowe Price Growth Stock Fund from the Plan's set of investment options.

266. By failing to remove the T. Rowe Price Growth Stock Fund from the Plan's set of investment options and replace it with one of the several available comparator funds, the 401(k) Committee and its individual members therefore failed to discharge their duties with the care, skill, diligence and prudence required by ERISA.

267. These breaches have caused substantial damage to the Plan, for which the 401(k) Committee and its individual members are jointly and severally liable.

268. The 401(k) Committee and its individual members knowingly participated in the breach of the other, knowing that such acts were a breach, enabled other fiduciaries to commit



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

**SECOND CLAIM**
**FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES**
**(Against the Company)**

269. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

270. Defendant Company had the authority to appoint and remove members or individuals of the 401(k) Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

271. Company had a duty to monitor those individuals to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the fiduciaries were not fulfilling their duties.

272. Company further had a duty to ensure that the Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis; and reported regularly to Company as Plan sponsor.

273. The objectively imprudent manner in which the 401(k) Committee failed to timely act to remove the T. Rowe Price Growth Stock Fund inferentially establishes that Company breached its duty to monitor by failing to monitor and evaluate the performance of 401(k) Plan fiduciaries or have a system in place for doing so; failing to monitor the process by which the Company 401(k) Committee evaluated, selected, and monitored plan investment options; and failing to remove investment options whose performance was inadequate in their fiduciary duties on the Company 401(k) Committee.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

274. As a consequence of these breaches of the duty to monitor, Plaintiff and other Plan participants suffered objectively unreasonable and unnecessary monetary losses in an amount to be determined at trial.

275. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Company is liable to restore to the 401(k) Plan all losses caused by its failure to adequately monitor individuals responsible for the failure to remove the TRP Growth Stock Fund on the 401(k) Committee, as well as equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## THIRD CLAIM
## BREACH OF DUTY OF LOYALTY (29 U.S.C. § 1104(a)(1)(A))
## (Against Company Plan Fiduciaries)

276. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

277. When exercising their discretion to allocate Plan Expenses to Plan participants and exercising discretion and control over Forfeited Plan Assets to reduce Company's Non-discretionary matching contributions, instead of defraying the reasonable costs of administering the Plan or allocating the Forfeited Plan Assets back to eligible Plan participants, the Company Plan Fiduciaries considered the best interest of Company and ignored the Plan document as opposed to the best interest of participants, in violation of ERISA.

278. When improperly exercising discretion and control over Forfeited Plan Assets and failing to use them to defray the reasonable costs of administering the Plan or allocating them back to the accounts of eligible Plan participants, the Company Plan Fiduciaries considered the best interests of Company, as opposed to Plan participants, in violation of ERISA.

279. Each Company Plan Fiduciary knowingly participated in the breach of the other Company Plan Fiduciaries, knowing that such acts were a breach, enabled other Company Plan Fiduciaries to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Company Plan Fiduciaries and failed to make any reasonable effort



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

under the circumstances to remedy the breach. Thus, each Company Plan Fiduciary is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

280. Plaintiff and the Class have suffered losses as a direct result of the Company Plan Fiduciaries' breach of their duty of loyalty in an amount to be determined at trial.

281. Pursuant to 29 U.S.C. § 1109(a), the Company Plan Fiduciaries are liable to restore to the Plan all losses caused by their fiduciary breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**FOURTH CLAIM**
**BREACH OF DUTY OF PRUDENCE (29 U.S.C. § 1104(A)(1)(b))**
**(Against Company Plan Fiduciaries)**

282. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

283. When exercising their discretion to allocate Plan Expenses to the Plan and exercising discretion and control over Forfeited Plan Assets to reduce Company contributions, the Company Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act ***solely*** in the interest of the Plan participants and beneficiaries and for the ***exclusive purpose*** of providing benefits to Plan participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA.

284. In deciding how to allocate Forfeited Plan Assets, the Company Plan Fiduciaries failed to undertake a reasoned and impartial decision-making process. Rather than investigate whether using Forfeited Plan Assets to defray Plan Expenses before offsetting Non-Discretionary Matching Employer Contributions would have been better for Plan participants, the Company Plan Fiduciaries reflexively used Forfeited Plan Assets to reduce Company's own contribution expenses while only devoting a fraction of Forfeited Plan Assets from Plan Years 2019-2022 toward Plan Expenses. The Company Plan Fiduciaries' imprudent process can be further inferred from the fact that, on information and belief, there was no risk of Company not



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

making its Non-Discretionary Matching Employer Contributions and no indication that Company's contribution levels were informed by the amount of Forfeited Plan Assets, and thus no benefit to participants from using Forfeited Plan Assets to offset Non-Discretionary Matching Employer Contributions instead of to defray Plan Expenses.

285. By refusing to use Forfeited Plan Assets to eliminate the Plan Expenses charged to participant accounts, and instead deciding to use these Plan assets only to reduce Company's own contribution expenses, the Company Plan Fiduciaries caused participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Expenses.

286. The Company Plan Fiduciaries also failed to investigate whether allowing millions of dollars of Forfeited Plan Assets to sit in an unallocated plan account at the end of each year instead of using those amounts to defray Plan Expenses was in the interest of the Plan and its participants. By instead allowing those Forfeited Plan Assets to remain unallocated, the Company Plan Fiduciaries caused the value of Plan participants' individual accounts to decrease as a result of expense deductions that would otherwise have been defrayed in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Expenses.

287. Had the Company Plan Fiduciaries conformed with the minimum standard of care required under ERISA, the Company Plan Fiduciaries would not have used Forfeited Plan Assets to solely reduce Company contributions.

288. Alternatively, had the Company Plan Fiduciaries conformed with the minimum standard of care required under ERISA, they would have used Forfeited Plan Assets to defray reasonable expenses of administering the Plan up to the amount of unallocated Forfeited Plan Assets.

289. Plaintiff has suffered losses as a direct result of the Company Plan Fiduciaries' breach of their duty of prudence.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

290. Pursuant to 29 U.S.C. § 1109(a), the Company Plan Fiduciaries are liable to restore to the Plan all losses caused by their fiduciary breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**FIFTH CLAIM**
**PROHIBITED TRANSACTIONS/SELF DEALING (29 U.S.C. § 1106(b))**
**(Against Company Plan Fiduciaries)**

291. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

292. 29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

293. Defendants were and continue to be Plan Fiduciaries. In their management and control of Forfeited Plan Assets, Defendants caused the Plan to use Plan assets (Forfeited Plan Assets) to fund Company's contractual obligation to make Non-Discretionary Matching Employer Contributions to the Plan. By allocating these Plan assets toward offsetting Company's Non-Discretionary Matching Employer Contributions obligations, Defendants saved Company millions of dollars in contractually obligated Non-Discretionary Matching Employer Contributions expenses. Defendants therefore dealt with the assets of the Plan in their own interest or for Company's own account, in violation of 29 U.S.C. § 1106(b)(1).

294. Additionally, or alternatively, Defendants in their individual capacity or as an agent of Defendant Company acted in a transaction involving the Plan on behalf of a party (Defendant Company) whose interests are adverse to the interests of the Plan and the interests of Plan participants and their beneficiaries in violation of 29 U.S.C. § 1106(b)(2) and received consideration for their own personal accounts from parties dealing with the Plan in connection



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

with transactions involving the assets of the Plan (Forfeited Plan Assets) in violation of 29 U.S.C. § 1106(b)(3) through the mechanism of receiving higher bonuses than they otherwise would have received.

295. As a result of this prohibited conduct, Defendants caused the Plan and Plan participants and Class to suffer losses in the amount of the Plan assets that were substituted for Non-Discretionary Matching Employer Contributions and lost earnings on those assets.

296. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

**SIXTH CLAIM**
**FIDUCIARY PROHIBITED TRANSACTIONS (29 U.S.C. § 1106(a))**
**(Against Company Plan Fiduciaries)**

297. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

298. 29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . exchange . . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan."

299. Defendants are parties in interest, as that term is defined under 29 U.S.C. § 1002 (14), because they are Plan Fiduciaries and because Company is the employer of Plan participants.

300. The Plan's third-party administrators and other service providers are also parties in interest. *See Cunningham*, 604 U.S. at 697 ("[ERISA], in turn defines "'party in interest'" to include various plan insiders, including the plan's administrator, sponsor, and its officers, as well as entities 'providing services to [the] plan.'") (internal citations omitted).

301. When Defendants elected to use Forfeited Plan Assets as a substitute for future employer contributions to the Plan, thereby saving Company millions of dollars in non-



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

discretionary contribution expenses, Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or use of Plan assets by or for the benefit of a party in interest.

302. As a result of these prohibited transactions, Defendants caused the Plan to suffer losses in the amount of the Forfeited Plan Assets that were not used to defray Plan Expenses and lost investment returns on those assets.

303. Additionally, when Defendants elected to use Forfeited Plan Assets as a substitute for Non-Discretionary Matching Employer Contributions to the Plan and not for Plan Expenses, Defendants caused the Plan to engage in prohibited transactions with the Plan's third-party administrator and other service providers for the payment of Plan Expenses from Plaintiff and all Plan participants' individual accounts, both directly and indirectly, that were sent to the Plan's third-party administrators and other third party service providers and that should have been paid in part or full by the Forfeited Plan Assets.

304. As a result of these prohibited transactions, Defendants caused the Plan to suffer losses in the amount of the Plan assets that were substituted for future employer contributions and the lost investment returns on those assets.

305. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited transactions alleged in this claim, to reverse and/or correct the prohibited transactions, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

## <u>SEVENTH CLAIM</u>
## BREACH OF ERISA'S ANTI-INUREMENT PROVISION (29 U.S.C. § 1103(C)(1))
## (Against Company Plan Fiduciaries)

306. Plaintiff realleges and incorporates herein by reference each preceding paragraph of this Complaint as though fully set forth herein.

307. Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

308. The balance in a participant's accounts that a participant forfeits when incurring a break in service prior to full vesting of the Company's contributions to the participant's account is an asset of the Plan.

309. By electing to utilize the majority of these Plan assets as a substitute for the Company's own future contributions to the Plan, thereby saving the Company millions of dollars in contribution expenses, Defendants caused the assets of the plan to inure to the benefit of the employer and failed to defray reasonable expenses of the plan in violation of 29 U.S.C. § 1103(c)(1) and 29 U.S.C. § 1104(a)(1)(A).

310. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from violation of ERISA's anti-inurement provision as alleged in this claim and to restore to the Plan all profits secured through their use of Plan assets. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

311. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

**PRAYER FOR RELIEF**

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

B. Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C. A Declaration that Defendants have breached their fiduciary duties under ERISA;

D. An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, and restoring to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

E. An Order requiring Company to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Company as necessary to effectuate relief, and to prevent Company's unjust enrichment;

F. An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H. An award of pre-judgment and post-judgment interest;

I. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

J. Leave to amend this Complaint to conform to the evidence; and

K. Such other and further relief as the Court deems equitable and just

RESPECTFULLY SUBMITTED AND DATED this 19th day of August, 2026.

TERRELL MARSHALL LAW GROUP PLLC

By: */s/ Beth E. Terrell*
Beth E. Terrell, WSBA #26759
Email: bterrell@terrellmarshall.com

By: */s/ Jennifer Rust Murray*
Jennifer Rust Murray, WSBA #36983
Email: jmurray@terrellmarshall.com

1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

Paul J. Sharman, *Pro Hac Vice Forthcoming*
Email: paul@sharman-law.com
THE SHARMAN LAW FIRM LLC
11175 Cicero Drive, Suite 100
Alpharetta, Georgia 30022
Telephone: (678) 242-5297
Facsimile: (678) 802-2129

Michael J. Geist, *Pro Hac Vice Forthcoming*
Email: mjg@geistlawgroup.com
GEIST LAW GROUP LLC
5 Fairfield Drive
Catonsville, Maryland 21228
Telephone: (443) 834-6850

*Attorneys for Plaintiff*

## APPENDIX A

Data Sources and Methodology:

All calculations and data related to investments and indexes used in the Complaint and Appendix are derived from publicly available information and/or Morningstar. As noted by the United States Government Accountability Office ("GAO"), "Morningstar is a financial services firm that provides data on mutual funds, collective investment trusts, and other investments." GAO Report to Congressional Requesters, GAO-24-105364, p.2, fn2.

The charts are highlighted from the titled investments' perspective. For example, the first chart below provides the T. Rowe Price Growth Stock returns and metric performance numbers. Red indicates metrics in which the T. Rowe Price Growth Stock underperformed the comparator and green indicates metrics in which it outperformed.

From 2019 through 2020 the Plan was invested in TRP Growth Stock Trust C. At some point in 2021 the Plan transferred the assets of TRP Growth C to TRP Growth Stock Trust E. The tables below assume that the Plan was invested in TRP Growth Stock Trust E starting January 1, 2021, which likely overstates the Plan's actual performance.

The appendix compares the year-end investment performance and risk-adjusted performance metrics of the T. Rowe Price Growth Stock Trust C & E against selected comparator funds over multiple trailing periods, measured as of each respective calendar year-end. Metrics include trailing returns (3-year and 5-year), risk-adjusted performance measures (e.g., Sharpe Ratio, Information Ratio, Alpha, and Sortino Ratio), with benchmark-dependent metrics calculated relative to the Russell 1000 Growth Total Return USD Index. For all metrics presented, higher values indicate more favorable performance. For each comparator fund, the third chart shows the difference between the T. Rowe Price Growth Stock Trust C and E and the comparator fund, calculated as comparator minus T. Rowe Price Growth Stock Trust C and E. Positive values therefore indicate that the comparator fund outperformed the T. Rowe Price Growth Stock Trust C and E on that metric for the applicable period, while negative values indicate the opposite. Color shading is used to visually distinguish relative outcomes, with red indicating metrics in which the T. Rowe Price Growth Stock Trust C and E underperformed and green indicating metrics in which it outperformed. At the bottom of each comparison, the exhibits summarize the total number of metrics evaluated for each year, the number of metrics in which the T. Rowe Price Growth Stock Trust C and E underperformed, and the percentage of underperforming metrics, providing a high-level view of comparative relative performance over time.

## T. Rowe Price Growth Stock Tr-C/Tr-E

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 10.53% | 20.36% | 21.12% | 28.84% | -0.49% | 1.97% | 4.93% | 30.33% |
| 5 - Year Return | 10.38% | 14.50% | 19.34% | 23.18% | 5.08% | 13.68% | 13.49% | 9.84% |
| Sharpe Ratio - 3 - Year | 0.732 | 1.283 | 0.975 | 1.412 | 0.067 | 0.086 | 0.141 | 1.533 |
| Sharpe Ratio - 5 - Year | 0.771 | 0.972 | 1.058 | 1.267 | 0.274 | 0.607 | 0.577 | 0.413 |
| Information Ratio 3 - Year | -0.126 | -0.030 | -0.450 | -1.049 | -1.698 | -1.317 | -1.254 | -0.283 |
| Information Ratio 5 - Year | -0.005 | -0.028 | -0.356 | -0.448 | -1.238 | -1.175 | -1.154 | -1.234 |
| Alpha 3 - Year | -0.72% | -0.30% | -1.51% | -3.85% | -7.98% | -6.56% | -5.31% | -0.52% |
| Alpha 5 - Year | -0.18% | -0.39% | -1.63% | -1.38% | -5.53% | -5.40% | -5.02% | -5.09% |
| Sortino Ratio - 3 - Year | 1.059 | 2.118 | 1.691 | 2.752 | 0.096 | 0.118 | 0.195 | 3.021 |
| Sortino Ratio - 5 - Year | 1.218 | 1.600 | 1.802 | 2.261 | 0.396 | 0.934 | 0.882 | 0.591 |

## Alger Focus Equity Z

| ALZFX | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 11.36% | 22.32% | 25.88% | 33.04% | 4.05% | 3.70% | 12.26% | 45.66% |
| 5 - Year Return | 11.14% | 14.77% | 22.06% | 26.27% | 8.99% | 16.95% | 19.92% | 18.96% |
| Sharpe Ratio - 3 - Year | 0.776 | 1.399 | 1.189 | 1.644 | 0.246 | 0.160 | 0.443 | 1.822 |
| Sharpe Ratio - 5 - Year | 0.831 | 0.990 | 1.210 | 1.437 | 0.450 | 0.756 | 0.837 | 0.771 |
| Information Ratio 3 - Year | 0.052 | 0.529 | 0.802 | -0.203 | -0.776 | -1.167 | 0.315 | 1.639 |
| Information Ratio 5 - Year | 0.179 | 0.035 | 0.262 | 0.212 | -0.460 | -0.569 | 0.167 | 0.485 |
| Alpha 3 - Year | -0.37% | 1.08% | 2.69% | 0.51% | -3.37% | -4.81% | 1.47% | 5.98% |
| Alpha 5 - Year | 0.44% | -0.25% | 0.83% | 1.41% | -1.67% | -2.11% | 0.74% | 2.34% |
| Sortino Ratio - 3 - Year | 1.140 | 2.222 | 2.153 | 3.524 | 0.372 | 0.228 | 0.666 | 4.062 |
| Sortino Ratio - 5 - Year | 1.299 | 1.574 | 2.167 | 2.678 | 0.677 | 1.225 | 1.395 | 1.260 |

### T. Rowe Price Growth Stock Tr-C/Tr-E & Alger Focus Equity Z Comparison

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 0.83% | 1.97% | 4.75% | 4.20% | 4.55% | 1.73% | 7.32% | 15.32% |
| 5 - Year Return | 0.76% | 0.27% | 2.72% | 3.08% | 3.91% | 3.28% | 6.43% | 9.12% |
| Sharpe Ratio - 3 - Year | 0.044 | 0.115 | 0.214 | 0.231 | 0.179 | 0.074 | 0.302 | 0.289 |
| Sharpe Ratio - 5 - Year | 0.060 | 0.018 | 0.152 | 0.171 | 0.176 | 0.149 | 0.260 | 0.358 |
| Information Ratio 3 - Year | 0.178 | 0.559 | 1.252 | 0.846 | 0.922 | 0.150 | 1.569 | 1.922 |
| Information Ratio 5 - Year | 0.184 | 0.063 | 0.617 | 0.660 | 0.778 | 0.607 | 1.321 | 1.719 |
| Alpha 3 - Year | 0.35% | 1.37% | 4.21% | 4.36% | 4.61% | 1.74% | 6.78% | 6.50% |
| Alpha 5 - Year | 0.62% | 0.13% | 2.47% | 2.79% | 3.86% | 3.29% | 5.76% | 7.43% |
| Sortino Ratio - 3 - Year | 0.081 | 0.104 | 0.462 | 0.772 | 0.276 | 0.110 | 0.471 | 1.041 |
| Sortino Ratio - 5 - Year | 0.081 | -0.026 | 0.365 | 0.417 | 0.281 | 0.292 | 0.513 | 0.669 |
| # of Underperforming Metrics | 10 | 9 | 10 | 10 | 10 | 10 | 10 | 10 |
| # of Total Metrics | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| % of Underperforming Metrics | **100%** | **90%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |

## T. Rowe Price Growth Stock Tr-C/Tr-E

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 10.53% | 20.36% | 21.12% | 28.84% | -0.49% | 1.97% | 4.93% | 30.33% |
| 5 - Year Return | 10.38% | 14.50% | 19.34% | 23.18% | 5.08% | 13.68% | 13.49% | 9.84% |
| Sharpe Ratio - 3 - Year | 0.732 | 1.283 | 0.975 | 1.412 | 0.067 | 0.086 | 0.141 | 1.533 |
| Sharpe Ratio - 5 - Year | 0.771 | 0.972 | 1.058 | 1.267 | 0.274 | 0.607 | 0.577 | 0.413 |
| Information Ratio 3 - Year | -0.126 | -0.030 | -0.450 | -1.049 | -1.698 | -1.317 | -1.254 | -0.283 |
| Information Ratio 5 - Year | -0.005 | -0.028 | -0.356 | -0.448 | -1.238 | -1.175 | -1.154 | -1.234 |
| Alpha 3 - Year | -0.72% | -0.30% | -1.51% | -3.85% | -7.98% | -6.56% | -5.31% | -0.52% |
| Alpha 5 - Year | -0.18% | -0.39% | -1.63% | -1.38% | -5.53% | -5.40% | -5.02% | -5.09% |
| Sortino Ratio - 3 - Year | 1.059 | 2.118 | 1.691 | 2.752 | 0.096 | 0.118 | 0.195 | 3.021 |
| Sortino Ratio - 5 - Year | 1.218 | 1.600 | 1.802 | 2.261 | 0.396 | 0.934 | 0.882 | 0.591 |

## Fidelity BlueChip Growth Commingled Pl Z

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 11.37% | 22.58% | 29.69% | 39.34% | 7.54% | 5.76% | 10.49% | 37.13% |
| 5 - Year Return | | | 25.07% | 29.66% | 10.74% | 21.24% | 21.83% | 14.51% |
| Sharpe Ratio - 3 - Year | 0.750 | 1.315 | 1.174 | 1.641 | 0.366 | 0.249 | 0.362 | 1.600 |
| Sharpe Ratio - 5 - Year | | | 1.199 | 1.419 | 0.488 | 0.835 | 0.838 | 0.592 |
| Information Ratio 3 - Year | 0.046 | 0.478 | 1.082 | 0.662 | -0.035 | -0.458 | 0.002 | 1.000 |
| Information Ratio 5 - Year | | | 0.688 | 0.682 | -0.035 | 0.241 | 0.399 | -0.130 |
| Alpha 3 - Year | -0.65% | -0.04% | 2.94% | 1.00% | -0.51% | -3.13% | -0.44% | 0.91% |
| Alpha 5 - Year | | | 0.82% | 1.52% | -0.88% | -0.33% | 0.86% | -1.69% |
| Sortino Ratio - 3 - Year | 1.111 | 2.112 | 2.209 | 3.524 | 0.575 | 0.366 | 0.539 | 3.243 |
| Sortino Ratio - 5 - Year | | | 2.210 | 2.736 | 0.760 | 1.401 | 1.421 | 0.901 |

### T. Rowe Price Growth Stock Tr-C/Tr-E & Fidelity BlueChip Growth Commingled Pl Z Comparison

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 0.84% | 2.23% | 8.57% | 10.50% | 8.03% | 3.79% | 5.55% | 6.80% |
| 5 - Year Return | | | 5.73% | 6.48% | 5.66% | 7.57% | 8.34% | 4.67% |
| Sharpe Ratio - 3 - Year | 0.018 | 0.032 | 0.199 | 0.229 | 0.299 | 0.164 | 0.221 | 0.068 |
| Sharpe Ratio - 5 - Year | | | 0.141 | 0.153 | 0.214 | 0.228 | 0.262 | 0.179 |
| Information Ratio 3 - Year | 0.172 | 0.508 | 1.532 | 1.711 | 1.664 | 0.860 | 1.256 | 1.283 |
| Information Ratio 5 - Year | | | 1.044 | 1.130 | 1.203 | 1.416 | 1.553 | 1.104 |
| Alpha 3 - Year | 0.07% | 0.26% | 4.45% | 4.85% | 7.48% | 3.43% | 4.87% | 1.43% |
| Alpha 5 - Year | | | 2.45% | 2.90% | 4.64% | 5.07% | 5.88% | 3.40% |
| Sortino Ratio - 3 - Year | 0.052 | -0.006 | 0.518 | 0.772 | 0.479 | 0.248 | 0.344 | 0.223 |
| Sortino Ratio - 5 - Year | | | 0.409 | 0.475 | 0.364 | 0.467 | 0.539 | 0.310 |
| # of Underperforming Metrics | 5 | 4 | 10 | 10 | 10 | 10 | 10 | 10 |
| # of Total Metrics | 5 | 5 | 10 | 10 | 10 | 10 | 10 | 10 |
| % of Underperforming Metrics | **100%** | **80%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |

## T. Rowe Price Growth Stock Tr-C/Tr-E

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 10.53% | 20.36% | 21.12% | 28.84% | -0.49% | 1.97% | 4.93% | 30.33% |
| 5 - Year Return | 10.38% | 14.50% | 19.34% | 23.18% | 5.08% | 13.68% | 13.49% | 9.84% |
| Sharpe Ratio - 3 - Year | 0.732 | 1.283 | 0.975 | 1.412 | 0.067 | 0.086 | 0.141 | 1.533 |
| Sharpe Ratio - 5 - Year | 0.771 | 0.972 | 1.058 | 1.267 | 0.274 | 0.607 | 0.577 | 0.413 |
| Information Ratio 3 - Year | -0.126 | -0.030 | -0.450 | -1.049 | -1.698 | -1.317 | -1.254 | -0.283 |
| Information Ratio 5 - Year | -0.005 | -0.028 | -0.356 | -0.448 | -1.238 | -1.175 | -1.154 | -1.234 |
| Alpha 3 - Year | -0.72% | -0.30% | -1.51% | -3.85% | -7.98% | -6.56% | -5.31% | -0.52% |
| Alpha 5 - Year | -0.18% | -0.39% | -1.63% | -1.38% | -5.53% | -5.40% | -5.02% | -5.09% |
| Sortino Ratio - 3 - Year | 1.059 | 2.118 | 1.691 | 2.752 | 0.096 | 0.118 | 0.195 | 3.021 |
| Sortino Ratio - 5 - Year | 1.218 | 1.600 | 1.802 | 2.261 | 0.396 | 0.934 | 0.882 | 0.591 |

## JPMCB Growth Advantage Inv

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 11.67% | 23.21% | 28.44% | 37.89% | 10.42% | 7.05% | 9.48% | 29.40% |
| 5 - Year Return | 11.16% | 16.00% | 24.26% | 29.02% | 12.97% | 21.15% | 20.18% | 13.47% |
| Sharpe Ratio - 3 - Year | 0.758 | 1.391 | 1.204 | 1.724 | 0.488 | 0.313 | 0.338 | 1.416 |
| Sharpe Ratio - 5 - Year | 0.790 | 1.029 | 1.226 | 1.479 | 0.606 | 0.910 | 0.850 | 0.596 |
| Information Ratio 3 - Year | 0.119 | 0.765 | 1.291 | 0.702 | 0.658 | -0.511 | -0.346 | -0.495 |
| Information Ratio 5 - Year | 0.153 | 0.296 | 0.703 | 0.831 | 0.515 | 0.391 | 0.297 | -0.542 |
| Alpha 3 - Year | -0.70% | 0.95% | 3.25% | 2.11% | 2.41% | -1.56% | -0.96% | -2.31% |
| Alpha 5 - Year | 0.01% | 0.37% | 1.16% | 2.16% | 1.64% | 1.13% | 0.80% | -1.59% |
| Sortino Ratio - 3 - Year | 1.094 | 2.286 | 2.251 | 3.808 | 0.790 | 0.465 | 0.505 | 2.744 |
| Sortino Ratio - 5 - Year | 1.204 | 1.631 | 2.212 | 2.831 | 0.971 | 1.568 | 1.455 | 0.917 |

### T. Rowe Price Growth Stock Tr-C/Tr-E & JPMCB Growth Advantage Inv Comparison

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 1.14% | 2.86% | 7.32% | 9.06% | 10.91% | 5.09% | 4.54% | -0.94% |
| 5 - Year Return | 0.78% | 1.50% | 4.92% | 5.83% | 7.89% | 7.47% | 6.69% | 3.63% |
| Sharpe Ratio - 3 - Year | 0.027 | 0.108 | 0.229 | 0.312 | 0.421 | 0.227 | 0.198 | -0.116 |
| Sharpe Ratio - 5 - Year | 0.019 | 0.057 | 0.168 | 0.213 | 0.332 | 0.303 | 0.273 | 0.184 |
| Information Ratio 3 - Year | 0.245 | 0.795 | 1.741 | 1.751 | 2.356 | 0.807 | 0.908 | -0.212 |
| Information Ratio 5 - Year | 0.158 | 0.324 | 1.059 | 1.280 | 1.753 | 1.567 | 1.451 | 0.692 |
| Alpha 3 - Year | 0.02% | 1.25% | 4.76% | 5.96% | 10.40% | 4.99% | 4.35% | -1.79% |
| Alpha 5 - Year | 0.19% | 0.76% | 2.79% | 3.54% | 7.17% | 6.53% | 5.82% | 3.50% |
| Sortino Ratio - 3 - Year | 0.035 | 0.168 | 0.560 | 1.056 | 0.695 | 0.347 | 0.310 | -0.277 |
| Sortino Ratio - 5 - Year | -0.015 | 0.031 | 0.410 | 0.571 | 0.575 | 0.635 | 0.573 | 0.325 |
| # of Underperforming Metrics | 9 | 10 | 10 | 10 | 10 | 10 | 10 | 5 |
| # of Total Metrics | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| % of Underperforming Metrics | **90%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **50%** |

## T. Rowe Price Growth Stock Tr-C/Tr-E

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 10.53% | 20.36% | 21.12% | 28.84% | -0.49% | 1.97% | 4.93% | 30.33% |
| 5 - Year Return | 10.38% | 14.50% | 19.34% | 23.18% | 5.08% | 13.68% | 13.49% | 9.84% |
| Sharpe Ratio - 3 - Year | 0.732 | 1.283 | 0.975 | 1.412 | 0.067 | 0.086 | 0.141 | 1.533 |
| Sharpe Ratio - 5 - Year | 0.771 | 0.972 | 1.058 | 1.267 | 0.274 | 0.607 | 0.577 | 0.413 |
| Information Ratio 3 - Year | -0.126 | -0.030 | -0.450 | -1.049 | -1.698 | -1.317 | -1.254 | -0.283 |
| Information Ratio 5 - Year | -0.005 | -0.028 | -0.356 | -0.448 | -1.238 | -1.175 | -1.154 | -1.234 |
| Alpha 3 - Year | -0.72% | -0.30% | -1.51% | -3.85% | -7.98% | -6.56% | -5.31% | -0.52% |
| Alpha 5 - Year | -0.18% | -0.39% | -1.63% | -1.38% | -5.53% | -5.40% | -5.02% | -5.09% |
| Sortino Ratio - 3 - Year | 1.059 | 2.118 | 1.691 | 2.752 | 0.096 | 0.118 | 0.195 | 3.021 |
| Sortino Ratio - 5 - Year | 1.218 | 1.600 | 1.802 | 2.261 | 0.396 | 0.934 | 0.882 | 0.591 |

## Putnam Large Cap Growth R6

| PGOEX | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 12.97% | 22.72% | 24.99% | 32.72% | 6.08% | 7.54% | 10.59% | 30.41% |
| 5 - Year Return | 10.79% | 14.90% | 22.35% | 25.84% | 10.91% | 18.79% | 18.23% | 13.77% |
| Sharpe Ratio - 3 - Year | 0.933 | 1.519 | 1.199 | 1.671 | 0.329 | 0.332 | 0.388 | 1.524 |
| Sharpe Ratio - 5 - Year | 0.821 | 1.039 | 1.291 | 1.457 | 0.541 | 0.850 | 0.796 | 0.610 |
| Information Ratio 3 - Year | 0.617 | 0.735 | 0.524 | -0.340 | -0.563 | -0.522 | 0.051 | -0.296 |
| Information Ratio 5 - Year | 0.137 | 0.092 | 0.387 | 0.148 | -0.016 | -0.222 | -0.244 | -0.662 |
| Alpha 3 - Year | 1.53% | 2.51% | 2.77% | 0.70% | -1.47% | -1.24% | 0.06% | -0.73% |
| Alpha 5 - Year | 0.08% | 0.23% | 1.98% | 1.48% | 0.18% | -0.24% | -0.43% | -1.44% |
| Sortino Ratio - 3 - Year | 1.421 | 2.520 | 2.139 | 3.420 | 0.503 | 0.496 | 0.578 | 2.909 |
| Sortino Ratio - 5 - Year | 1.347 | 1.756 | 2.309 | 2.674 | 0.833 | 1.400 | 1.304 | 0.931 |

### T. Rowe Price Growth Stock Tr-C/Tr-E & Putnam Large Cap Growth R6 Comparison

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 2.44% | 2.36% | 3.87% | 3.88% | 6.57% | 5.57% | 5.66% | 0.08% |
| 5 - Year Return | 0.41% | 0.39% | 3.01% | 2.66% | 5.83% | 5.11% | 4.74% | 3.93% |
| Sharpe Ratio - 3 - Year | 0.201 | 0.235 | 0.223 | 0.258 | 0.261 | 0.247 | 0.247 | -0.009 |
| Sharpe Ratio - 5 - Year | 0.050 | 0.068 | 0.233 | 0.190 | 0.267 | 0.243 | 0.220 | 0.197 |
| Information Ratio 3 - Year | 0.743 | 0.765 | 0.974 | 0.709 | 1.135 | 0.795 | 1.305 | -0.013 |
| Information Ratio 5 - Year | 0.142 | 0.120 | 0.743 | 0.596 | 1.222 | 0.954 | 0.910 | 0.572 |
| Alpha 3 - Year | 2.25% | 2.81% | 4.28% | 4.55% | 6.51% | 5.32% | 5.37% | -0.21% |
| Alpha 5 - Year | 0.26% | 0.61% | 3.61% | 2.86% | 5.70% | 5.16% | 4.60% | 3.65% |
| Sortino Ratio - 3 - Year | 0.362 | 0.402 | 0.449 | 0.668 | 0.408 | 0.378 | 0.383 | -0.112 |
| Sortino Ratio - 5 - Year | 0.129 | 0.156 | 0.508 | 0.413 | 0.437 | 0.466 | 0.422 | 0.339 |
| # of Underperforming Metrics | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 6 |
| # of Total Metrics | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| % of Underperforming Metrics | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **60%** |

## T. Rowe Price Growth Stock Tr-C/Tr-E

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 10.53% | 20.36% | 21.12% | 28.84% | -0.49% | 1.97% | 4.93% | 30.33% |
| 5 - Year Return | 10.38% | 14.50% | 19.34% | 23.18% | 5.08% | 13.68% | 13.49% | 9.84% |
| Sharpe Ratio - 3 - Year | 0.732 | 1.283 | 0.975 | 1.412 | 0.067 | 0.086 | 0.141 | 1.533 |
| Sharpe Ratio - 5 - Year | 0.771 | 0.972 | 1.058 | 1.267 | 0.274 | 0.607 | 0.577 | 0.413 |
| Sortino Ratio - 3 - Year | 1.059 | 2.118 | 1.691 | 2.752 | 0.096 | 0.118 | 0.195 | 3.021 |
| Sortino Ratio - 5 - Year | 1.218 | 1.600 | 1.802 | 2.261 | 0.396 | 0.934 | 0.882 | 0.591 |

## The Vanguard Russell 1000 Growth Index

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 11.17% | 20.50% | 23.00% | 34.09% | 7.79% | 8.88% | 10.49% | 31.17% |
| 5 - Year Return | 10.42% | 14.64% | 21.02% | 25.33% | 10.97% | 19.52% | 18.98% | 15.33% |
| Sharpe Ratio - 3 - Year | 0.833 | 1.351 | 1.066 | 1.652 | 0.395 | 0.395 | 0.388 | 1.585 |
| Sharpe Ratio - 5 - Year | 0.833 | 1.043 | 1.185 | 1.385 | 0.538 | 0.870 | 0.824 | 0.692 |
| Sortino Ratio - 3 - Year | 1.214 | 2.096 | 1.846 | 3.295 | 0.612 | 0.590 | 0.575 | 3.156 |
| Sortino Ratio - 5 - Year | 1.329 | 1.709 | 2.069 | 2.473 | 0.825 | 1.433 | 1.360 | 1.070 |

### T. Rowe Price Growth Stock Tr-C/Tr-E & The Vanguard Russell 1000 Growth Index Comparison

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 0.64% | 0.14% | 1.88% | 5.25% | 8.28% | 6.91% | 5.56% | 0.84% |
| 5 - Year Return | 0.04% | 0.14% | 1.68% | 2.15% | 5.89% | 5.84% | 5.49% | 5.49% |
| Sharpe Ratio - 3 - Year | 0.102 | 0.068 | 0.090 | 0.239 | 0.327 | 0.309 | 0.247 | 0.052 |
| Sharpe Ratio - 5 - Year | 0.061 | 0.071 | 0.127 | 0.119 | 0.264 | 0.263 | 0.247 | 0.279 |
| Sortino Ratio - 3 - Year | 0.155 | -0.022 | 0.155 | 0.544 | 0.516 | 0.472 | 0.381 | 0.135 |
| Sortino Ratio - 5 - Year | 0.111 | 0.109 | 0.268 | 0.213 | 0.429 | 0.499 | 0.478 | 0.479 |
| # of Underperforming Metrics | 6 | 5 | 6 | 6 | 6 | 6 | 6 | 6 |
| # of Total Metrics | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| % of Underperforming Metrics | **100%** | **83%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |